IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

_____
JONATHAN ZUHOVITZKY and    )
 ESTHER ZUHOVITZKY     )  Civil Action No.:
             )
      PlaintiffS,   )
             )
   -against-     )
             )
UBS AG CHE 101.329.562; UBS AG CHE 412.669.376; )
UBS SECURITIES LLC, UBS FINANCIAL SERVICES )
INC.;  UBS ASSET MANAGEMENT (US) INC.  )
ASSET MANAGEMENT (US) Inc.    )
      Defendants.  )
_____

Plaintiffs JONATHAN ZUHOVITZKY and ESTHER ZUHOVITZKY by and through their

attorneys Cohen, LaBarbera & Landrigan, LLP, make their complaint and allege as follows:


**JURISDICTION AND VENUE**

 *1.*  This is a civil action arising under certain Treaties of the United States. This Court has

   original subject matter jurisdiction under such provisions of law as include without

   limitation under  28 U.S.C. §1331; 28 U.S.C. §1332 and 28 U.S.C. §1350 (the Alien Tort

   Statute). This Court has Supplemental jurisdiction over any and all state law claims

   forming part of the same case and controversy under such provisions of law as include

   without limitation under 28 U.S.C. §1367.

 *2.*  This Court has personal jurisdiction over all Defendants because all Defendants have

   substantial interests within this District and the genesis of the action lies within the failure

   of the UBS Defendants to uphold the requirements of a Settlement Agreement signed

   between UBS and the United States.

3. Venue lies in the Southern District of New York pursuant to 28 U.S.C. §1391 because Defendants a substantial part of the events or omissions giving rise to this action occurred in the Southern District of New York.

## THE PARTIES

*Plaintiffs*

4. Jonathan Zuhovitzky (hereinafter "Mr. Zuhovitzky" or *"Plaintiff husband"* ) is a citizen of Israel and naturalized citizen of the United States of full age, currently residing in Berlin, Germany.

5. Esther Zuhovitzky (hereinafter "Mrs. Zuhovitzky or "Plaintiff Wife" is a citizen of Austria and Israel of full age, currently residing in Kfar-Shmaryahu, Israel.

*Defendants*

6. UBS AG, CHE 101.329.561 Bahnhofstrasse 45, 8001 Zurich, Switzerland, def. 1 and

7. UBS AG CHE 412.669.376, Bahnhofstrasse 45, 8001, Zurich, Switzerland, def. 2 and

8. UBS Securities LLC, UBS Financial Services, Inc., UBS Asset Management (US) Inc., or any other division subsidiary or affiliate of UBS AG with offices and enterprises within the United States ("other UBS entities").

9. Defendant 1 is a Swiss bank in the legal form of a stock corporation with offices in Zurich and Basel, Switzerland. Defendant 2 was entered into the commercial register of Switzerland in 2014. Defendant 2 is also a  bank and is based in Zurich. Defendant 1 transferred to Defendant 2 all of the assets and liabilities of the Retail & Corporate and Wealth Management divisions.

## PRELIMINARY OVERVIEW

2

10. Plaintiffs charge defendants with fraud, fraudulent concealment and breach of fiduciary duty for actions taken and concealed by UBS whichdenied Plaintiffs an opportunity to prevent information regarding Plaintiff Wife's UBS account from being wrongfully released to the United States taxing authorities.

11. The dispute between the parties has its origins in the so-called tax dispute between the United States of America and various Swiss banks.

12. At the beginning of 2010, in connection with an administrative assistance procedure, UBS sent Plaintiff wife's bank details to the Swiss Federal Tax Administration (FTA) and subsequently to the Internal Revenue Service ("IRS") of the United States.

13. Esther Zuhovitzky has never been a U.S citizen or resident and therefore her bank account did not fall under the purview of the request for administrative assistance from the IRS.

14. Jonathan Zuhovitzky is a naturalized U.S. citizen who held signatory authority (a POA) over his wife's account.

15. It is unclear to this date, on what grounds UBS determined that Plaintiffs account should be accredited as the account of a "U.S. Person" such that disclosure of same to the IRS was appropriate.

16. In providing this data, UBS failed to provide Plaintiff Wife with any notice or information regarding its intent to disclose Plaintiff Wife's account information to the IRS.

17. UBS was required, under the terms of both the Treaty request between the United States and the Swiss government as well as the Settlement Agreement between the United States and UBS to provide account holders with the opportunity to protest the disclosure of their private and privileged banking information.

18. Due to UBS's failure to provide advance notice to the account holder, the Plaintiffs were denied the opportunity to defend themselves and prevent the wrongful transfer of account information.

19. UBS and its employees engaged in fraudulent and covert behaviors over a number of years for the benefit of UBS that led to serious financial and other harms to the Plaintiffs.


## FACTUAL BACKGROUND

*Plaintiffs' Personal History*

20. Mr. Zuhovitzky was born in Tel Aviv, Israel in 1945.

21. Mr. Zuhovitzky is a dual citizen of the United States and Israel.

22. Mr. Zuhovitzky is a naturalized citizen of the United States, having become a citizen in 1999.

23. During the years that Plaintiff Husband worked and resided within the United States, he lived within the borough of Manhattan, in New York City.

24. Mr. Zuhovitzky currently resides in Berlin, Germany

25. Mrs. Zuhovitzky was born in Tokyo, Japan in 1946.

26. Mrs. Zuhovitzky is a dual citizen of Austria and Israel.

27. Mrs. Zuhovitzky has never been a U.S. citizen or resident, a fact conceded by the United States Department of Treasury and Internal Revenue Service during a court case before the United States Tax Court.

28. During the years that her husband lived and worked in New York, New York, Mrs. Zuhovitzky never resided in New York nor anywhere within the United States.

29. Mrs. Zuhovitzky maintains residences in Israel, Austria, and Switzerland.

*30.* Mrs. Zuhovitzky's primary residence is in Kfar-Shmaryahu, a suburb of greater Tel Aviv, Israel.

***Plaintiff Wife's UBS Account***

*31.* Plaintiff Wife first opened an account at UBS Switzerland during the 1960's, while attending school and residing in Switzerland.

*32.* In October 1988, Plaintiff Wife opened the UBS account which is the subject of this complaint in a Zurich branch of UBS (acct. # 8026)

*33.* Plaintiff Wife maintained this account from 1988 to 2014.

*34.* Beginning with the opening of the account in 1988, Plaintiff Husband, as well as two adult children of the Plaintiffs held  Powers of Attorney (POA) to the account.

*35.* Plaintiffs' children are citizens and residents of Israel.

*36.* According to UBS business records, Plaintiffs' relationship with UBS spans nearly 50 years, going back to accounts maintained by their parents.

*37.* Both families had ties to the Zurich area and visited Switzerland regularly, at least three times annually.

*38.* Throughout the time the account #8026 was held at UBS, plaintiff wife's  center of life was always on Hachoresh Street in Kfar Shmaryahu, Israel, where she has owned a house since 1974.

*39.* Mrs. Zuhovitzky suffers from significant dyslexia. Due to this condition, she prefers not to handle money or business matters and hence has always relied upon her husband and adult children to manage her affairs.

*40.* UBS  was well aware that Mrs Zuhovitzky did not manage her financial affairs, having noted on a business record, dated and signed between August 2, 2005 and August 22,

2005 by no fewer than five UBS officials,  that the BO (beneficial owner) of the account (i.e. Mrs. Zuhovitzky ) resided in Israel but that her husband resided in New York,  USA and he 'decided on all investment decisions on behalf of client with regarding the portfolio managment. The client is not involved in any investment decision."

41. For this reason, the address of the husband's rental apartment in New York City, New York, was provided for a correspondence address for a period of time.

42. Notwithstanding the husband's New York address placed on forms, for all of the years the account was held open, Mrs. Zuhovitzky engaged in a "mail hold" policy with UBS to have all mail related to the account, held at the branch where the account was managed in Zurich.

43. Therefore mail related to the account was not "delivered" to the New York address, the Zurich apartment, or the home address in Israel.

44. Plaintiffs are an international family with ties to a number of countries,  including Israel, Austria, Switzerland, the United States, and Japan.

45. Mrs. Zuhovitzky relied on her husband, who was in the United States, and her grown children, who were in Israel, to manage her financial affairs.

46. The family determined that mail should be picked up in person from the branch in Zurich by whomever was visiting Switzerland. By this means, important mail or financial announcements would not be delivered to an address where no family member was currently *in situ,* and mail received from the bank was signed for so that all family members would be aware of which member received the mail on what dates.

47. Plaintiffs and their adult children visited Zurich an average of 5-10times per year, so at no time did important correspondence go unattended to for long.

*48.* During 2004 and since, Plaintiff Wife has kept an apartment in Zurich. For the purposes

of paying rent and maintenance, Plaintiff Wife opened a separate account with UBS

(acct # "6911"), still open to this day.

*49.* On December 24, 2004, Mrs. Zuhovitzky provided a notice to her customer advisor for

acct # 8026,  Mr. Marcel Beeler,  that he should update her  address to Weinplatz 3, 8001

Zurich.

*50.* This address changed was officially processed by UBS on January 1, 2005.

*51.* On July 27, 2005, Mr. Marcel Beeler, the customer advisor for acct #8026, inexplicably

and without authorization from the account holder, changed the address for the account

to: 3 Daniel Frisch Street, 13th Floor, Tel Aviv Israel, 64731.

*52.* Plaintiffs had no knowledge of the change of address.  They were never consulted nor

advised that the change had been made.  Mrs. Zuhovitzky was never requested to

complete a change of address form at any of her later multiple visits to the bank.

*53.*  In 2011, Mrs. Zuhovitzky determined that she wished to change the account address

from Weinplatz 3 in Zurich, Switzerland  to her long time address in Israel at 56

Hachoresh Street in Kfar Shmaryahu, Israel.

*54.* It was only at the time of making the request to change her address from Zurich,

Switzerland to Kfar Shmaryahu that Mrs. Zuhovitzky was made aware that at some prior

date the bank had unilaterally changed her address within their system.

*55.* At that time, Mrs. Zuhovitzky had no reason to think the wrongful change of address was

anything more than an annoyance and she complied with completing the form handed to

her by the banker which indicated she was changing her address from 3 Daniel Frisch

Street, 13th Floor, Tel Aviv, Israel to 56 Hachoresh Street, Kfar Shmaryahu, Israel.

*56.* In October 2005, shortly after Mr. Beeler changed the address for the account to the Daniel Frisch Street, Tel Aviv address, Mr. Beeler and the UBS supervisory chain above him also completed a PEP/SCAP Exception Form.

*57.* Plaintiffs were not advised about the necessity to complete form, they did not request such exemption, were never shown the form, nor were they asked to sign it.

*58.* The actual regulations or actions that might require this form are known only to the Defendants. On information and belief, Plaintiffs conclude that by listing Mrs. Zuhovitzky's address as Israel (rather than Zurich) and by indicating on the form that Mr. Zuhovitzky lived in New York and made all investment decisions for the account, that UBS was thus allowed to "exempt" the account from being moved out of the North-America/US NorthEast region and into a local Zurich division.

*59.* Plaintiffs contend that this form was completed so that UBS could maintain the account in the "cross-border U.S. " division from which UBS received increased profits.

*60.* The PEP/SCAP form was signed by Marcel Beeler, the Client Advisor; Daniel H Perron, the Supervisory Client Advisor; Michel Guignard, the RMM for North America; Bruno Arnold, the Business Section Head, and Michel Adjadj, the Head of the Business Unit on dates ranging from August 2, 2005 until August 22, 2005.

*61.* Plaintiffs became aware of this form only in June 2017, when a copy was provided to their U.S. tax attorney from the IRS Office of Counsel during discovery related to the subsequent U.S. Tax Court Trial.

### *The United States, the John Doe Summons and Plaintiff's Wife's UBS Account*

*62.* In 2008, the United States government moved against the Swiss Banking industry searching for possible United States taxpayers hiding assets in Swiss bank accounts.

8

*63.* On June 30th 2008, the United States Justice Department asked the U.S. District Court for the Southern District of Florida to serve what is known as the "John Doe summons" on UBS to obtain information about possible accounts being held by United States persons whose identities were unknown.

*64.* On July 1, 2008, the U.S. District Court for the Southern District of Florida issued an order to direct UBS to produce records identifying U.S. taxpayers with accounts at UBS in Switzerland.

*65.* Plaintiffs became embroiled in the dispute between the United States and UBS when Plaintiff wife's account number was wrongly included in the accounts identified as belonging to "U.S. persons".

*66.* The provision by UBS of information and documents related to the account of Esther Zuhovitzky to the United States government was done wrongfully, in violation of Swiss Banking laws,  in violation of the US/Swiss Tax Convention (the "Tax Treaty") of 1998, and in violation of the Settlement Agreement signed between the United States and UBS.

*67.* As a result the IRS received more than a thousand pages of documents from UBS related to Esther Zuhovitzky's account.

*68.* The documentation provided by UBS unequivocally identified Esther Zuhovitzky as the sole beneficial owner of the account.

*69.* The documentation provided by UBS unequivocally identified Esther Zuhovitzky as a citizen of Austria and Israel.

*70.* The documentation provided by UBS unequivocally stated that Jonathan Zuhovitzky was not a beneficial owner of the account and held only a Power of Attorney.

*71.* The IRS Office of Chief Counsel conceded that Plaintiff Husband ( a U.S. person) had no property rights over the assets in the UBS account and that Plaintiff wife was never a citizen or resident of the United States.

**UBS DUTY TO NOTIFY PLAINTIFFS PRIOR TO RELEASE OF BANK INFORMATION**

**The Deferred Prosecution Agreement:**

*72.* In February 18, 2009, pursuant to a criminal prosecution brought by the United States against UBS in the United States District Court for the Southern District of Florida, UBS signed a Deferred Prosecution Agreement (the "DPA) to forestall criminal prosecution on conspiracy a number of criminal tax and fraud charges.

*73.* Pursuant to Exhibit D of the DPA, UBS was required to send to all U.S. based clients a letter notifying them that: as of July 17, 2008 UBS publicly announced that it would no longer provide cross-border services to U.S. domiciled private clients through non-U.S. regulated entities, such as the UBS unit that was serving U.S. clients at that time.

*74.* The letter notified clients that UBS would not longer be able to provide services through the current arrangement and that clients were being provided with notice to terminate their current banking relationship and all associated services and agreements with {the client's master account number] within 45 days from the date of the letter.

*75.* Plaintiffs received *no such notice* from UBS or any of its subsidiaries.

*76.* Plaintiffs had no reason to be expecting such a notice, since Plaintiffs were always fully aware that Esther Zuhovitzky, as beneficial owner of the account, was not a U.S. person and therefor her banking relationship with UBS should not be affected by the US/Swiss conflagration.

**The John Doe Summons and the Swiss/US Agreement**

77. On August 19, 2009, Switzerland and the USA signed an agreement on an official request for assistance from the IRS regarding UBS (AS 2009 5669, hereinafter: UBS Agreement 09). In this agreement, Switzerland undertook to process a request for administrative assistance from the USA via US clients of UBS on the basis of the criteria set out in the annex to this agreement. On the basis of the criteria set out in the annex, the contracting parties estimated and expected that around 4,450 current or netted accounts would fall under the administrative assistance request. With regard to these accounts, Switzerland promised to ensure that a final ruling on the surrender of the requested information could be issued within a certain period of time after receipt of the request for administrative assistance.

78. In a separate agreement with the IRS, UBS undertook to comply with the FTA's ruling on the release of the information covered by the request for official assistance within the specified period after receipt of the notification from the FTA of the receipt of the request for official assistance from the IRS (hereinafter referred to as: Settlement Agreement).

79. Under the terms of the  Settlement Agreement, UBS was required to send notifications to all "US persons" whose accounts at UBS were subject to the administrative assistance request, as soon as such accounts were identified, and to inform the account holders that they should immediately designate an authorized representative in Switzerland to receive notifications regarding the administrative assistance request and their accounts

80. On August 31, 2009, the IRS then submitted a request for administrative assistance to the FTA, referring to the UBS Agreement 09. The IRS requested disclosure of information about American taxpayers who between January 1, 2001 and December 31, 2008 had the authority to sign or otherwise dispose of bank accounts with UBS for which UBS (1) did not hold a

completed form "W-9",  or  (2) did not possess the form "1099" in the name of the respective taxpayer.

**The UBS/U.S. Agreement**

*81.* The UBS Agreement 09 is a mutual agreement which falls under the control of the "Convention Between the United States of America and the Swiss Confederation For the Avoidance of Double Taxation with Respect to Taxes on Income, (i.e. the "US/Swiss Tax Treaty) signed October 2, 1996 in Washington D.C. which provides for administrative assistance only in the case of tax and tax fraud but not in the case of tax evasion.

*82.* The Agreement between the Swiss Confederation and the United States specifically stated that for indicated accounts UBS would : provide notice to account holders under the Treaty request.

*83.* Article 4 of the Agreement between the Swiss and the U.S. governments indicates that UBS, in a separate agreement between UBS and the IRS, committed to compliance with the Swiss/US agreement.

*84.* The Swiss/U.S. Agreement was signed by Guillaum Scheurer as Charge d'Affaires of Switzerland and Barry B. Shott as Deputy Commissioner of the Internal Revenue Service.

*85.*  According to the UBS/US Settlement Agreement, "UBS agreed to send notices based on available contact information to U.S. persons whose accounts with UBS are subject to the Treaty Request informing such U.S. persons that they should promptly designate an agent in Switzerland for the receipt of communications concerning the Treaty Request with respect to their accounts as soon as such accounts are identified by UBS."

*86.* The form and content of such notice was included as Exhibit B to the UBS/US Settlement Agreement.

*87.* The proposed letter begins: "We have been informed that the U.S. Interna! Revenue Service

("IRS") has submitted a request for administrative assistance to the Swiss Federal Tax

Administration (the "SFTA"), pursuant to Article 26 of the 1996 Convention Between the

United States of America and the Swiss Confederation for the Avoidance of Double Taxation

with Respect to Taxes on Income (the "1996 Convention"), seeking information with regard

to accounts of certain U.S. persons owned either directly or through an offshore company

that are or have been maintained with UBS AG ("UBS") in Switzerland. This letter provides

notice to you that your account with UBS appears to be within the scope of the above-

referenced IRS request. If the SFTA were to make a determination that information relating

to your UBS account is required to be provided to the IRS pursuant to the 1996 Convention,

the SFTA would make available to the IRS information and records relating to your account

with UBS. UBS has been directed to convey to you the following information:

*88.* As with the Notice required by the DPA, Plaintiffs did not receive such a notice from UBS.

*89.* As was the case with the Notice required by the DPA, Plaintiffs had no reason to believe or

inquire that they should be on notice about such a letter, because they were always well

aware that Mrs. Zuhovitzky was not a U.S person and therefore her banking relationship with

UBS was not indicated in the fray between the United States and the Swiss banking industry.

*90.* It was not until some time in 2018, when Plaintiff's U.S. tax counsel came across a copy of

the UBS "warning letter" in another matter, that Plaintiff's were made aware that such a

letter existed or that UBS had had a duty to notify any customers whose banking information

it was considering providing to the IRS .

*91.* The letter dated March 16, 2010 with the subject "NOTICE TO UBS

ACCOUNTHOLDERS" contained the notification that allegedly the applicant's account at

UBS was covered by the IRS's request for administrative assistance, as well as information on the administrative assistance procedure and the applicant's Available rights, in particular the designation of an authorized recipient in Switzerland.

*92.* Despite the long relationship history and more than adequate knowledge that the account holder was not a U.S. person, and despite frequent in-person contacts with Plaintiffs and other POA's to the account, UBS never once mentioned to Plaintiffs that UBS had sent a letter notifying Plaintiff's that it was proposing to release Mrs. Zuhovitzky's banking information to the United States.

*93.* UBS failed to notify Plaintiffs that it had sent the letter to 3 Daniel Frisch Street, Tel Aviv, Israel until Plaintiffs directly inquired of UBS through Swiss attorneys.

*94.* It was only in a response dated November 29, 2018 that UBS finally admitted it had sent the requisite notice to the incorrect and unrelated address on March 16, 2020.

*95.* Even upon providing Plaintiffs notice that the required Notice had been sent, albeit to an incorrect address, UBS hid the fact that they knew Plaintiffs had no notice because the letter had not been delivered and was returned to UBS in Zurich on or about May 12, 2010.

*96.* According to UBS' own business records, Plaintiffs visited the branch office in Zurich on March 29, 2010 at which time, according to the records, Plaintiffs collected any mail being held. No mention of this most important Notices is made.

*97.* According to UBS' own business records, a telephone call was held on May 28, 2010 regarding the transfer of some funds. Again, no mention is made that such an important notice has been sent and that account holder must timely take action in order to prevent the release of her banking information to a foreign government.

*98.* According to UBS' own business records, Plaintiffs visited the bank on July 9, 2010. The

Client Advisor, whose identity cannot be determined because the Plaintiffs' copy of the

record is redacted, submits a lengthy note about the Plaintiffs and their families' long

history with UBS and how very pleased with the services of UBS they are.  The mail

being held in regards to the account is noted to have been provided to the Plaintiffs and

there is no mention of the Letter which by this time has been sent to Tel Aviv and has

returned to UBS.

*99.* According to UBS records, Plaintiffs again visited the Zurich branch on July 27, 2010 at

which time  mails were once again handed over with UBS failing to provide the Notice

which is was required to provide under the US/UBS Settlement Agreement and which

had been returned to UBS months prior.

*100.* Continuing throughout the 2010 year, Plaintiffs had several more interactions

with UBS staff, both by phone and in person. No mention of the returned letter was ever

recorded in the business logs.

*101.* Plaintiffs had no means of knowing of the existence of the requisite Notice which

was required to be sent by UBS on the conditions of the US/UBS Settlement Agreement.

*102.* Plaintiffs also had no reason to believe that they should be on inquiry about

whether such a Notice would relate to Mrs. Zuhovitzky's UBS account, because they had

no reason to suspect that she would be treated as a U.S. account holder.

*103.* It was only by serendipity that Plaintiffs were notified that UBS had been required

to provide notice to account holders prior to releasing their account information to the

IRS by dint of the fact that Plaintiffs U.S  Tax Counsel had other clients in similar cases

who had received such notices from UBS.

*104.*      It took a direct inquiry from Plaintiffs Swiss attorneys to finally make UBS admit that it had sent such a Notice to Plaintiffs and to make UBS provide the address to which UBS sent the Notice.

*105.*      Even after admitting it had sent Notice to the address at 3 Daniel Frisch Street, Tel Aviv in March 2010, UBS played coy and failed to admit that it was on notice that that Plaintiffs had not been properly notified because it had received the Notice back by return mail.

*106.*      It took a written request, penned by Plaintiff Wife, who remained a client of UBS, to actually prise a copy of the letter from UBS in May of 2019.  Clearly UBS was aware that it had the Notice in its files all these years and could have easily provided it to Plaintiffs so that they might have taken action to protect their  interests.

*107.*      If, on the other hand, UBS had informed the plaintiff in a timely and dutiful manner (as it was required to do under the Agreement), Plaintiffs would have been able to exercise the information and procedural rights to they were entitled.


*Audit and Investigation by Internal Revenue Service*

*108.*      Because of the information obtained from UBS regarding Esther Zuhovitzky's account, the United States Internal Revenue Service  initiated an income tax audit which was expanded to cover tax years 2000-2008.  This audit was based solely on purported failure to report income from the UBS account of Esther Zuhovitzky.

*109.*      During the income tax audit, the IRS also chose to pursue the assessment of a civil penalty against Jonathan Zuhovitzky for failing to include information about his wife's UBS account on his annual FBAR filings.

*110.*     Throughout the audit, IRS staff acted in a particularly aggressive manner, refusing to share information about the nature of the audit, clearly because it was considered "A UBS/John Doe Summons case.

*111.*     The amount of bad press in the United States surrounding UBS and prior matters such as the criminal prosecution that led to the DPA, clearly fueled the IRS' ire and intentions to prosecute Plaintiffs to the fullest extent.

*112.*     It seems that everywhere, the assumption is that anyone who does business with UBS, is guilty by association. This mindset made it much more difficult, complicated, and time consuming for Plaintiffs to prove their case.

*113.*     After extending the audit from one to nine years, the audit division referred Plaintiffs' case to the Criminal Investigation division of the Internal Revenue Service.

*114.*     Plaintiff Jonathan Zuhovitzky was a highly regarded professional within the international banking community. Being placed under an investigation for possible criminal tax fraud investigation gravely injured his reputation and contributed to his decision to retire from the New York banking arena.

*115.*     The IRS Criminal Investigation Unit closed the investigation with no findings and reported that it was clear that Plaintiff Wife, the sole beneficial owner of the account, was an Austrian citizen and not a United States person, that she inherited the funds in the UBS , and that no unreported U.S. income had ever been deposited into the account.

*116.*     On December 3, 2015, the IRS issued a Notice of Deficiency based on the audit. It demanded tax payments of USD 2,167,692.00 as well as penalties of USD 1,625,769.00 with additional interest that would have brought the total to nearly $7,500,000.00

*117.*     This assessment was based exclusively on the income generated on UBS acct #8026 as this account was the only source of income considered under the audit.

*118.*     The IRS auditor also assessed a proposed FBAR penalty against Mr. Zuhovitzky, in the amount of Five Million, One Hundred and Twenty-Three thousand ($5,123,000.00) dollars for failing to include information about his wife's account on his annual FBAR report filings.

*119.*     With the addition of "administrative penalties" and interest, the proposed FBAR penalty eventually reached $9.7 million.

*120.*     Ironically, the IRS auditor proposed no FBAR penalty against Mrs. Zuhovitzky, on her own account, for not reporting her foreign account on an FBAR, because it was recognized that as a non-U.S. person, Mrs. Zuhovitzky had no duty to file any FBAR reports.

**PLAINTIFFS' NECESSARY U.S. COURT ACTIONS**

*121.*     Due to the wrongful provision of information about Mrs. Zuhovitzky's UBS account, which absent UBS' fraudulent and concealing behavior could have been entirely avoided, the Plaintiffs were forced to fight prolonged and costly court battles to clear their names and prevent the government from trying to collect on more than $17 million dollars of wrongfully proposed taxes, penalties and interests.

*122.*     Plaintiffs' filed a Petition with the United States Tax Court and the Matter was heard in July 2019.

*123.*     After less than a full day of trial, the government conceded that it could not bear the burden of proof to maintain allegation of fraud and it quickly requested settlement discussions.

18

*124.*     On consideration that an opinion from the Tax Court might take up to a year to be announced, with the threat that the Government might then appeal an Order in the Plaintiffs' favor, and knowing that they still needed to bring suit over the FBAR penalty, the plaintiffs determined that it was in their best interest to be prudent and reach a settlement for the smallest possible amount.

*125.*     The Parties used as a baseline for the amounts to be taken into consideration for settlement negotiations the amounts proposed for the two latest and smallest tax years that had been under audit.  Plaintiffs proposed a settlement amount that was half of each of those two final years and the government quickly acquiesced.

*126.*     The United States Tax Court does not have jurisdiction to hear cases involving FBAR penalties and so the Plaintiffs' only option for challenging the FBAR penalty was to bring suit against the various agencies of the United States government responsible, which was done in the Federal District Court for the Southern District of New York  in June 2020.

*127.*     By April 2021 the Government  conceded the case, settling the proposed FBAR penalty, which by that time was reaching an egregious $10 million dollars with interest growing at some $32,000 per month,  with ZERO due from the Plaintiffs.

**Plaintiffs' Damages**

*128.*     The wrongful disclosure of Mrs. Zuhovtizky's banking details caused  by the fraudulent actions of UBS, forced the plaintiffs into a nearly decade long battle against the IRS and the US government, made even more difficult by the fact that neither Plaintiff resided within the United States during the time of the legal actions.

*129.*     Plaintiffs are elderly and the fear and stress of having to fight pitched legal battles with the largest government in the world has caused irreparable physical and emotional health issues as well as placing almost unbearable stress upon their relationships.

*130.*     Over the years, UBS engaged in a number of actions which led directly to harm to the Plaintiffs.

*131.*     It is clear that for a number of years, UBS listed the address of the account holder as being at her husband's New York address, despite clear knowledge that her primary residence was in Israel because UBS was able to generate greater profits on its "cross-border" accounts within the United States.

*132.*     In late 2004, Plaintiff Wife, the account holder, requested that her account be listed with an address at her Zurich apartment. In January 2005 UBS officially changed the address of the account holder to her local Zurich address. Within months, the UBS customer adviser unilaterally, with no direction from the customer and without her knowledge or signature changed the address for the account to an address in Tel Aviv, Israel which has never been associated with the account holder.

*133.*     This unrequested change in address appears to have been motivated by the desire by the UBS team to obtain a PEP/SCAP exception such that the account could therefore be maintained in the NorthAmerican NE unit servicing clients within the United States and thus garnering higher profits for UBS.

*134.*     Plaintiffs had no knowledge of the incorrect change of address and therefor no reason to request that it be corrected.

*135.*     When required to Notify clients within the "cross-border U.S" enterprises that they would no longer be able to service those accounts and that under an agreement

between the U.S. and Swiss governments information on those accounts would be shared with the U.S. taxing authorities- UBS hid the fact that it had sent the required notice to the incorrect address which it had created and then failed to notify the account holder even after UBS had full knowledge that the Notice required under the US/Swiss Treaty had not been delivered.

136.     The fraudulent concealment by UBS of actions taken by UBS over the years directly led to the inappropriate and unwarranted disclosure of Mrs. Zuhovitzky's banking information which would have been easily avoided had she been provided the required notification and opportunity to protest the release of her information.

137.     The completely unfounded allegations of tax fraud and dishonesty, coupled with being placed under a criminal tax investigation,  irreparably tainted Mr. Zuhovitzky's professional reputation causing him financial harm from lost revenue.

138.     During the tax audit on the part of the IRS and the subsequent litigation before the United States Tax Court, extensive legal services from specialized tax attorneys as well as the services of several accountants and financial experts were necessary in order to carry out a detailed analysis of their more than ten years of banking history and of their activities.

139.     The costs of the actions which Plaintiffs were forced to take to protect their interests have exceeded some $700,000 to date.

140.     The costs of the loss of business opportunities and revenue to Plaintiff Husband based on harm caused to his professional reputation as well as the excessive demands on his time and energy to marshal the legal and accounting resources and review family

financial history that was needed to fight these battles have averaged some $200,000 per year for a decade for an estimated loss of $2,000,000.00.

*141.*     The damages for pain and suffering from emotional distress and negative health consequences will be left for the jury to determine.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Fraud as to All Defendants)

*142.*     Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

*143.*  For the relevant periods described in this Complaint, the UBS Defendants undertook a duty to its customers when it signed the US/UBS Settlement Agreement and agreed to certain necessary actions designed to provide clients from an unwarranted but potentially devastating exposure of their private banking date to a hostile government.

*144.*  Defendants made a representation to Plaintiffs that they would adhere to the conditions of the Agreements reached under the auspices of the US/Swiss Tax Treaty which required Defendants to Notify affected customers of the potential threat of the release of their bank information.

*145.*   Within the banking relationship, Defendants committed to following the protocols and regulations of Swiss banking law. Under these protocols, Defendants were not permitted to change a clients address without specific permission and authorization from the client.

*146.*  Defendants concealed actions committed by UBS for the benefit of UBS which violated the laws and norms of banking. By way of example but without limitation, on or about July 27, 2005, the UBS Customer Account Manager then assigned to Plaintiffs' account, unilaterally, with no direction or authorization from Plaintiff, changed the address for the account to an address in Tel Aviv, Israel which did not belong to Plaintiffs.

*147.* Defendants concealed the material fact that they had mailed the Notice, required by the US/UBS Settlement Agreement to the incorrect address, which was assigned to the account only by the actions of the UBS account manager who had no authority to do so.

*148.* Defendants concealed from Plaintiffs the knowledge that Defendants had a duty to provide notice to the Plaintiffs of their right to contest the release of any information from Plaintiff Wife's account and that Defendants had a duty, under Swiss Banking law, the US/Swiss Tax Treaty and the US/UBS Settlement Agreement to notify Plaintiffs of that right.

*149.* The misrepresentations were material as evidenced by the fact that following two long drawn out legal battles with the United States taxing authorities, Plaintiffs proved victorious in beating nearly $17 million dollars in proposed taxes, penalties and interest because they were able to show that Plaintiff Wife was never a U.S. person and therefor her UBS bank account never fell under the purview of the John Doe Summons and her information never should have been released.

*150.* The Defendants intentionally, knowingly, and willfully hid and concealed their wrongful actions in order to benefit themselves, to maintain higher profit margins and to prevent Plaintiffs from removing substantial assets from within the UBS account.

*151.* Defendants knew they were concealing material knowledge from Plaintiffs when for almost ten years they failed to provide to Plaintiffs the required Notice- even after it had been returned to them through the mails.  It is evident that Defendants were aware they were in possession of the required Notice, because they were able to produce the returned Letter and envelope when Plaintiffs finally had the knowledge needed to demand it.

*152.* Defendants purposefully concealed their misrepresentation with the intent to deceive Plaintiffs for the Purpose of inducing Plaintiffs to maintain their accounts with Defendants.

*153.* The Plaintiffs relied on Defendants to proceed within the tenets of Swiss Banking law, within the tenets of the international tax treaty between the United States and the Swiss Confederation and the Settlement Agreement that UBS itself signed with the United States.

*154.* Plaintiffs, being well aware that Mrs. Zuhovitzky was never a U.S. person, had no reason to expect any involvement with the U.S taxing authorities over her Swiss account. Plaintiffs had no cause to be "on notice" that they should make any inquiries as to whether Mrs. Zuhovitzky's account information might be shared with the United States, just as they had not notice to be concerned that their bank might violate common, international banking laws and share that information with any other nation to which Mrs. Zuhovitzky had no tax obligations.

*155.* Plaintiffs were reasonable in arriving at such belief due to the extensive relationship they had with Defendants and the facts and circumstances of the case.

*156.* As the direct and proximate result of the Defendants' fraudulent acts, the Plaintiffs suffered damages in an amount to be determined at trial but in any event not less than $3,750,000.00.

### AS AND FOR A SECOND CAUSE OF ACTION

### (Fraudulent Concealment as to all  Defendants)

*157.* Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

*158.* For the relevant periods described in this Complaint, the UBS Defendants undertook a duty to its customers when it signed the US/UBS Settlement Agreement and agreed to certain necessary actions designed to provide clients from an unwarranted but potentially devastating exposure of their private banking date to a hostile government.

159.     Defendants made a representation to Plaintiffs that they would adhere to the conditions of the Agreements reached under the auspices of the US/Swiss Tax Treaty which required Defendants to Notify affected customers of the potential threat of the release of their bank information.

160.     Within the banking relationship, Defendants committed to following the protocols and regulations of Swiss banking law. Under these protocols, Defendants were not permitted to change a clients address without specific permission and authorization from the client.

161.     Defendants concealed actions committed by UBS for the benefit of UBS which violated the laws and norms of banking. By way of example but without limitation, on or about July 27, 2005, the UBS Customer Account Manager then assigned to Plaintiffs' account, unilaterally, with no direction or authorization from Plaintiff, changed the address for the account to an address in Tel Aviv, Israel which did not belong to Plaintiffs.

162.     Defendants concealed the material fact that they had mailed the Notice, required by the US/UBS Settlement Agreement to the incorrect address, which was assigned to the account only by the actions of the UBS account manager who had no authority to do so.

163.     Defendants concealed from Plaintiffs the knowledge that Defendants had a duty to provide notice to the Plaintiffs of their right to contest the release of any information from Plaintiff Wife's account and that Defendants had a duty, under Swiss Banking law, the US/Swiss Tax Treaty and the US/UBS Settlement Agreement to notify Plaintiffs of that right.

*164.*     The misrepresentations were material as evidenced by the fact that following two long drawn out legal battles with the United States taxing authorities, Plaintiffs proved victorious in beating nearly $17 million dollars in proposed taxes, penalties and interest because they were able to show that Plaintiff Wife was never a U.S. person and therefor her UBS bank account never fell under the purview of the John Doe Summons and her information never should have been released.

*165.*     The Defendants intentionally, knowingly, and willfully hid and concealed their wrongful actions in order to benefit themselves, to maintain higher profit margins and to prevent Plaintiffs from removing substantial assets from within the UBS account.

*166.*     Defendants knew they were concealing material knowledge from Plaintiffs when for almost ten years they failed to provide to Plaintiffs the required Notice- even after it had been returned to them through the mails.  It is evident that Defendants were aware they were in possession of the required Notice, because they were able to produce the returned Letter and envelope when Plaintiffs finally had the knowledge needed to demand it.

*167.*     Defendants purposefully concealed their misrepresentation with the intent to deceive Plaintiffs for the Purpose of inducing Plaintiffs to maintain their accounts with Defendants.

*168.*     The Plaintiffs relied on Defendants to proceed within the tenets of Swiss Banking law,  within the tenets of the international tax treaty between the United States and the Swiss Confederation and the Settlement Agreement that UBS itself signed with the United States.

169.     Plaintiffs, being well aware that Mrs. Zuhovitzky was never a U.S. person, had no

reason to expect any involvement with the U.S taxing authorities over her Swiss account.

Plaintiffs had no cause to be "on notice" that they should make any inquiries as to

whether Mrs. Zuhovitzky's account information might be shared with the United States,

just as they had not notice to be concerned that their bank might violate common,

international banking laws and share that information with any other nation to which Mrs.

Zuhovitzky had no tax obligations.

170.     Plaintiffs were reasonable in arriving at such belief due to the extensive

relationship they had with Defendants and the facts and circumstances of the case.

171.     Defendants concealed their actions over a number of years, at least from 2005

through 2019.

172.     Defendants were in complete control of any evidence or documents that would

have provided Notice to Plaintiffs that Defendants had acted to conceal their own "bad

actions"

173.     Plaintiffs only came to know of the existence of the required "Notice" through a

lucky happenstance. Even after Plaintiffs made direct inquiry of why they had not

received such a Notice prior to Mrs. Zuhovitzky's bank details being provided to the

United States, UBS only acknowledged that the Notice had been sent and to what

address.

174.     Plaintiffs were required to press Defendants yet again, through formal written

request before Defendants acknowledged that the Notice had been returned to them and

had been in their possession for nearly a decade, during which time Defendants had

numerous addresses, phone numbers and opportunities during face to face meetings to have presented Plaintiffs with the Notice.

175.     Defendants actions in concealing their original frauds by ongoing incidences of hiding yet more information from Plaintiffs warrants the equitable tolling of all statutes of limitations due to fraudulent concealment.

176.     As the direct and proximate result of the Defendants' fraudulent acts, the Plaintiffs suffered damages in an amount to be determined at trial but in any event not less than $3,750,000.00.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty as to all  Defendants)

177.     Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.   Further, as escrow agents holding Plaintiffs' money and as their purported attorneys, Defendants Lau and L&A owed Plaintiffs the fiduciary duties of loyalty and care.

178. Defendants' fiduciary duties required that Defendants act in good faith and fair dealing with Plaintiffs and act in Plaintiffs' best interests.

179. Although not all bank/client relationships have been determined to meet the standards to create a fiduciary duty, prior case have found that in personal, private banking cases where the bank is given the right to determine clients investments, a fiduciary duty is created.

180. Further, in the instant case, we refer not to the general relationship UBS had with its clients, but rather to the special relationship it created when, in order to escape from criminal prosecution of its own actions, it signed a Settlement Agreement with the United States which placed its client's interests at risk,

*181.* By signing the US/UBS Settlement Agreement, UBS undertook to pledge to provide clients whose banking information might be wrongfully provided to the United States with an opportunity to protest and prevent the release of their information.

*182.* Defendants breached their fiduciary duties to Plaintiffs by failing to provide Notice of their rights to protest and by concealing their own culpability in that failure to provide notice.

*183.* Based on the foregoing, the Defendants failed to act in good faith and fair dealing with Plaintiffs and to act in Plaintiffs' best interests.

*184.* As the direct and proximate result of the Defendants' fraudulent acts, the Plaintiffs suffered damages in an amount to be determined at trial but in any event not less than $3,750,000.00.

*WHEREFORE*, Plaintiff demands judgment against the Defendants as follows:

a. Damages in an amount to be determined at trial but in any event not less than $3,750,000.00

b. Such other and further relief as the Court deems just, proper, and equitable.

Dated: Chester, New York
       December 28, 2021

COHEN, LABARBERA & LANDRIGAN, LLP

_/s/ Melissa A. Perry _____
Melissa A. Perry, Esq.
99 Brookside Avenue
Chester, New York 10918
Tel: (845) 291-1900
Fax: (845) 291-8601
Email: MPerry@cll-law.com

29

*Attorneys for Plaintiffs*