IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN ZUHOVITZKY and<br>ESTHER ZUHOVITZKY )<br> )<br> )<br> )<br>                    Plaintiffs, )<br> )<br>    -against- )<br> )<br>UBS AG CHE 101.329.562; UBS AG CHE 412.669.376; )<br>UBS SECURITIES LLC, UBS FINANCIAL SERVICES )<br>INC.;  UBS ASSET MANAGEMENT (US) INC. )<br> )<br>                    Defendants. )<br> )<br> ) | Civil Action No.:<br>   1:21-cv-11124<br><br>FIRST AMENDED<br>COMPLAINT<br><br>Hon. Katherine Polk Failla |

Plaintiffs JONATHAN ZUHOVITZKY and ESTHER ZUHOVITZKY by and through their

attorneys Cohen, LaBarbera & Landrigan, LLP, make their complaint and allege as follows:


**JURISDICTION AND VENUE**

*1.*  This is a civil action arising under certain provisions of Federal law, including without

limitation the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. 1962 et seq.

and because this action arises under the laws of the United States, this Court has original

subject matter jurisdiction under such provisions of law as include without limitation 28

U.S.C. §1331 and supplemental jurisdiction over any and all state law claims forming part

of the same case and controversy under such provisions of law as including without

limitation 28 U.S.C. §1367, 28 U.S.C. §1350 and certain Treaties of the United States This

Court has Supplemental jurisdiction over any and all state law claims forming part of the

same case and controversy under such provisions of law as including without limitation under 28 U.S.C. §1367.

2.  This Court has personal jurisdiction over all Defendants because all or some Defendants are domiciled in the State of New York, all Defendants transact business within the State of New York,  and all Defendants have sufficient minimum contacts with the State of New York.

3.  Venue lies in the Southern District of New York pursuant to 28 U.S.C. §1391 because some or all of Defendants have business locations within the Southern District of New York and a some or a substantial part of the events or omissions giving rise to this action occurred in the Southern District of New York.

**THE PARTIES**

**Plaintiffs:**

4.  Jonathan Zuhovitzky (hereinafter "Mr. Zuhovitzky" or *"Plaintiff husband"*) is a citizen of Israel and naturalized citizen of the United States of full age, currently residing in Berlin, Germany.

5.  Esther Zuhovitzky (hereinafter "Mrs. Zuhovitzky or "Plaintiff Wife" is a citizen of Austria and Israel of full age, currently residing in Kfar-Shmaryahu, Israel.

**Defendants:**

6.   UBS AG, CHE 101.329.561 Bahnhofstrasse 45, 8001 Zurich, Switzerland, def. 1 and

7.   UBS AG CHE 412.669.376, Bahnhofstrasse 45, 8001, Zurich, Switzerland, def. 2 and

8.   UBS Securities LLC, UBS Financial Services, Inc., UBS Asset Management (US) Inc., or any other division subsidiary or affiliate of UBS AG with offices and enterprises within the United States ("other UBS entities").

2

*9.*     Defendant 1 is a Swiss bank in the legal form of a stock corporation with offices in Zurich and Basel, Switzerland. Defendant 2 was entered into the commercial register of Switzerland in 2014. Defendant 2 is also a bank and is based in Zurich. Defendant 1 transferred to Defendant 2 all of the assets and liabilities of the Retail & Corporate and Wealth Management divisions.

## PRELIMINARY OVERVIEW

*10.* Plaintiffs, a couple in their mid-70's have been burdened for a decade with battling the biggest government in the world because of fraudulent actions taken by UBS, its subsidiaries and agents for the benefit of UBS. Defendants have continued to lie and keep Plaintiffs "in the dark" throughout the years in order to hide their illicit actions in an effort to protect UBS from consequences of its acknowledged criminal behavior.

*11.* Plaintiff Wife held an account with UBS in Zurich from the years 1988-2014.

*12.* Plaintiffs were not born or raised in the United States, and they maintain significant connections with several other countries.  Mr. Zuhovitzky, a naturalized American citizen lived and worked in New York City from approximately 1990 through 2010. Mrs. Zuhovitzky has never been a U.S. person.

*13.* Because of the knowing, willful, and illegal conduct of UBS at several different dates and times, Plaintiffs were forced to immerse themselves in difficult and complex international legal battles for over a decade. These battles continue with the matter at hand.  During those long years Plaintiffs had absolutely no option but to be ensnared by four separate legal battles.

*14.* Over the past ten or more years, Plaintiffs have had to invest a huge portion of their time and energies to; protect their names, reputations, and property;  to locate, collate, and

analyze thousands of documents, some of which Defendants controlled; and to live in a state of continuous anxiety and uncertainty; attacked by the largest government on the planet for many millions of dollars; exposed to threats and intimidation by representatives of the largest taxing authority in the world; and viewed as accomplices to the much publicized wrongdoings of UBS.  Because of the continuous revelations of fraudulent and criminal activities by UBS worldwide, the efforts of Plaintiffs to clear their names were many folds more difficult, lengthy and expensive due to what appears to be a global assumption that anyone who is a client of UBS shares in their guilt by association.

*15.* All of this was inflicted upon a couple who are both over 75 years of age. The stress of this monumental struggle has taken a tremendous toll - emotionally, familywise, health wise and financially. UBS, the giant global financial conglomerate, had substantial, and in the end -determinative, assistance from the intervention of the Swiss government in stopping the efforts of the United States government to prosecute UBS and force it to violate Swiss law. Plaintiffs have had no such serendipitous assistance and have had to face this onslaught on their own.

*16.* Meanwhile as evidenced by media reports and court filings around the globe, the UBS defendants have blithely continued to actively engage in fraudulent actions in a number of jurisdictions designed to assist their clients in tax fraud and allow UBS itself to wrongly profit from its own illegal actions.

*17.* Plaintiffs charge defendants with civil RICO, fraud, fraudulent concealment, and breach of fiduciary duty for actions taken and facts concealed by UBS.

*18.* Over the past two decades UBS has been prosecuted for criminal activity numerous times, within the Courts and the administrative tribunals of the United States, as well as within

the courts and agencies of other nations. UBS has agreed several times to the filing of Criminal Informations and admitted criminal behavior designed to defraud the United States. In these matters UBS has avoided full criminal prosecution by agreeing to pay over a BILLION dollars for their acknowledged criminal acts. These criminal acts, acknowledged and admitted by UBS meet the requirements under the Racketeer Influenced and Corrupt Organizations Act codified under 18 U.S.C. 1961 *et seq.*

19. In 2010 UBS wrongly disclosed detailed data of Mrs. Zuhovitkzy's account to the United States taxing authority ("IRS") via the Swiss tax authorities.

20. UBS, its subsidiaries, and agents, in conspiring to, committing, and then hiding actions related to Plaintiff's account, which were part of the above broader RICO endeavor have caused serious harm to Plaintiffs.

21. In 2005, UBS through its agent(s) purposefully and deceitfully changed the address of the Plaintiff's account without her knowledge or authorization from Switzerland to Israel. UBS and its agents then created an exception document that authorized the UBS office in Zurich to service the account within UBS's cross-border "North-American Division" where the UBS team would earn higher revenues.

22. The damages to Plaintiffs are miniscule in proportion to the financial damages caused by Defendants widespread and admitted pattern of fraud and RICO endeavors, as has been well documented within the courts and media of the United States for the past two decades, but Plaintiffs damages are directly caused by this same pattern of behavior.

23. Defendants have admitted in numerous federal cases that they engaged in criminal actions taken to defraud the United States, state and municipal governments, and their own clients

by engaging in numerous illegal banking, investment, and tax planning activities within the United States (as well as in other jurisdictions across the globe).

24. Plaintiffs' damages are a direct outcome of the 2008-2009 dispute between the United States and its taxing authority, the IRS, UBS, and the Swiss Government which dispute focused on Defendants' illegal activities within the United States.

25. At the beginning of 2010, in connection with a request for administrative assistance under the Swiss/ U.S Tax Treaty, UBS knowingly disregarded certain provisions of the tax treaty and the Agreements signed by the US, Switzerland and UBS and sent Plaintiff wife's bank account information to the Swiss Federal Tax Administration (FTA) which forwarded it to the Internal Revenue Service ("IRS") of the United States.

26. Defendants were aware at all times, that Esther Zuhovitzky was not a U.S citizen or resident and therefore her bank account did not fall under the purview of the IRS request for administrative assistance.

27. Jonathan Zuhovitzky a naturalized U.S. citizen, held signatory authority (a POA) over his wife's account.

28. It is unclear to this date, how or why Defendants selected the account of Plaintiff Wife who was well known to the bank as a non-U.S. person. Moreover, the bank always knew that the funds in the account never originated in the United States. No explanation of how and why the account was selected has ever been provided to Plaintiffs.

29. In providing Plaintiff Wife's this data, UBS knowingly failed to uphold its legal duty, as directed by both the agreement between the US and Swiss governments and the agreement between UBS and the IRS.

*30.* By failing to comply with the directives of the Agreements, UBS violated both Swiss banking and criminal law when it disclosed Plaintiff Wife's privileged banking information.

*31.* UBS was explicitly required, under both agreements to notify account holders whose data may be potentially disclosed about their right to dispute in Swiss court any disclosure. The arrangement to allow a fast-track appeal to the Swiss court was designed particularly to avoid wrongful disclosure of data belonging to non-US persons.

*32.* The failure to provide any notice to Plaintiffs was directly caused by illicit actions knowingly taken by UBS to change the account address and house the account within the North-American division, rather than UBS domestic division.

*33.* Defendants continued decisions to withhold information from Plaintiffs denied them any of the legal actions that were encouraged and recommended by the Swiss Authorities to mitigate potential damages.

*34.* Due to UBS's failure to provide advance notice to the account holder, the Plaintiffs were denied the opportunity to defend themselves and prevent the wrongful and illegal transfer of Mrs. Zuhovitzky's account information.

*35.* UBS and its employees were and remain involved in a RICO endeavor evincing fraudulent, illicit, and covert behaviors for the purposed of benefitting UBS and its individual employees which are the direct cause of the significant financial and other harms reaped upon the Plaintiffs.

**FACTUAL BACKGROUND**

**Plaintiffs' Personal History**

*36.* Mr. Zuhovitzky was born in Tel Aviv, Israel in 1945.

*37.* Mr. Zuhovitzky is a dual citizen of the United States and Israel.

*38.* Mr. Zuhovitzky is a naturalized citizen of the United States, having become a citizen in 1999.

*39.* During the years that Plaintiff Husband worked and resided within the United States, he lived within the borough of Manhattan, in New York City.

*40.* Mr. Zuhovitzky currently resides in Berlin, Germany

*41.* Mrs. Zuhovitzky was born in Tokyo, Japan in 1946.

*42.* Mrs. Zuhovitzky is a dual citizen of Austria and Israel.

*43.* Mrs. Zuhovitzky has never been a U.S. citizen or resident, a fact conceded by the United States Department of Treasury and IRS during the case before the United States Tax Court dealing with the subject matter of this complaint.

*44.* During the years that her husband lived and worked in New York, New York, Mrs. Zuhovitzky never resided in New York nor anywhere within the United States.

*45.* Mrs. Zuhovitzky maintains residences in Israel, Austria, and Switzerland.

*46.* Mrs. Zuhovitzky's primary residence is in Kfar-Shmaryahu, a suburb of greater Tel Aviv, Israel.

**The UBS Account:**

*47.* Plaintiff Wife remains a client and account holder with UBS in Zurich to this date.

*48.* In October 1988, Plaintiff Wife opened the UBS account which is the subject of this complaint in a Zurich branch of UBS (acct. # 8026)

*49.* Plaintiff Wife maintained this account from 1988 to 2014.

8

*50.* As of the opening of the account in 1988, Plaintiff Husband held Power of Attorney (POA) to the account.

*51.* Throughout the time that account #8026 was open at UBS, plaintiff wife's center of life was always in Kfar Shmaryahu, Israel, where she has owned a house since 1974.

*52.* Mrs. Zuhovitzky suffers from significant dyslexia. Due to this condition, she prefers not to handle money or business matters and hence has always relied upon her husband and adult children to manage her affairs.

*53.* UBS's business records and written documents related to the account indicate that UBS was aware that Mrs. Zuhovitzky resided in Israel and that she did not manage her financial affairs.

*54.* A UBS form entitled Exemption Authorization Form for PEP or SCAP Relationships ("the PEP/SCAP Form") completed by a number of UBS employees, managers and executives in 2005 noted that the BO (beneficial owner) of the account (i.e. Mrs. Zuhovitzky) resided in Israel while her husband resided in New York, USA and he 'decided on all investment decisions on behalf of client with regarding the portfolio management. The client is not involved in any investment decision."

*55.* For this reason, the address of the husband's rental apartment in New York City was provided for correspondence purposes for a period of time.

*56.* Notwithstanding the husband's New York address placed on forms until 2004, for all of the years the account was held open, Mrs. Zuhovitzky chose a "mail hold" policy with UBS to have all mail related to the account, held at the branch where the account was managed in Zurich.

**57.** Therefore, mail related to the account was not "delivered" to the New York address, the Zurich apartment, or the home address in Israel.

**58.** Plaintiffs and their family members visited Zurich an average of 5-10 times per year, so at no time did any correspondence go unattended for too long.

**59.** Since 2004 Plaintiff Wife has kept an apartment in Zurich. For the purposes of household expenses, Plaintiff Wife opened a separate account with UBS which is still open to this day.

**60.** On December 24, 2004, Mrs. Zuhovitzky wrote to her customer advisor for acct # 8026, Mr. Marcel Beeler, requesting to change her address to Weinplatz 3, 8001 Zurich.

**61.** According to UBS documents, this address change was officially and properly processed by UBS on January 1, 2005.

**The Illicit Address Change by UBS:**

**62.** On July 27, 2005, Mr. Marcel Beeler, the customer advisor for acct #8026, inexplicably and without authorization from the account holder, changed the address for the account to: 3 Daniel Frisch Street, 13th Floor, Tel Aviv Israel, 64731.

**63.** Plaintiffs had no knowledge of the change of address. They were never consulted nor advised that such change had been made. The bank's new address form was signed by Mr. Beeler without bearing Plaintiff Wife's signature.

**64.** Despite numerous in-person visits to the bank during 2005 and subsequent years, Marcel Beeler never requested that Mrs. Zuhovitzky execute a change of address form to make the address change official and authorized. Since the address form is kept at the bank and no copy was given to Plaintiff, Plaintiff had no idea that her address was changed.

65. After late 2008, when Mr. Beeler has abruptly discontinued as customer adviser to account #8026, none of the subsequent UBS customer advisers have asked to execute a proper change of address signed by Mrs. Zuhovitzky.

66. During 2005 and subsequent years none of the UBS client advisers, bankers or employees who handled information regarding Mrs. Zuhovitzky's account and interacted with various family members, ever indicated that the account address had been changed to 3 Daniel Frisch Street, 13th Floor, Tel Aviv, Israel.

67. In 2011, Mrs. Zuhovitzky wished to change the account address from Weinplatz 3 in Zurich, Switzerland, which she believed was the address credited to her account, to her long-time address in Kfar Shmaryahu, Israel.

68. It was only at the time of making the request to change her address from Zurich, Switzerland to Kfar Shmaryahu, in 2011, that Mrs. Zuhovitzky was made aware that the bank had unilaterally changed her address within their system six years earlier!

69. At that time, Mrs. Zuhovitzky had no reason to think the wrongful change of address was anything more than an annoyance.  She complied with completing the form handed to her by another banker (who replaced Mr. Beeler) which indicated she was changing her address from 3 Daniel Frisch Street, 13th Floor, Tel Aviv, Israel to Hachoresh Street, Kfar Shmaryahu, Israel.

**The PEP/SCAP Form:**

70. In October 2005, shortly after Mr. Beeler 's unauthorized change of address for the account, Mr. Beeler also initiated the execution of a UBS "Exemption Authorization Form for PEP or SCAP Relationships."

71. Plaintiffs were not advised about the necessity to complete such a form. Plaintiffs did not request such exemption.  Plaintiffs were never shown the form. Plaintiffs did not sign this form, nor were they asked to sign it.

72. The actual regulations or considerations that might require this form are known only to the Defendants and must be clarified by them.

73. By information and belief, PEP refers to certain "politically exposed persons" – such as political figures or heads of state for whom greater security of their account data might be necessary.

74. By information and belief, SCAP refers to certain countries, such as developing countries or countries in locations in the world with more unstable political or financial regimes where additional duties of care should be taken.

75. By information and belief, Israel, where Marcel Beeler transferred the address of the account to, is one of those nations.

76. By information and belief, Plaintiffs assert that Mr. Beeler and those above him within UBS purposefully made the decision to change Mrs. Zuhovitzky's address to Israel (rather than Zurich) and then completed the PEP/SCAP form with the intention of creating a paper trail which allowed the account to be housed within the North-America/US North-East region rather than the local Zurich division.

77. Plaintiffs assert that UBS and its agents changed the address of the account to Israel and completed the PEP/SCAP Form in order to ensure that Mrs. Zuhovitzky 's account was maintained in the North American division, within the U.S. cross-border business, where both the individuals involved and UBS, would generate higher revenues.

78. The PEP/SCAP form was signed by Marcel Beeler, as the Client Advisor.

*79.* The PEP/SCAP form was signed by Daniel H Perron, the Supervisor of the Client Advisor.

*80.* The PEP/SCAP form was signed by Michel Guignard, MD as the RMM for North America on August 5, 2005.

*81.* The PEP/SCAP form was signed by an UBS official whose name is not clearly available, as the Wealth Management Americas International on August 8, 2005.

*82.* The PEP/SCAP form was signed Bruno Arnold, the Business Sector Head on August 18, 2005.

*83.* The PEP/SCAP form was signed by Michel Adjadj, as General Manager on August 22, 2005.

*84.* Despite the need for so many official UBS signatures, UBS never consulted with Plaintiffs about the need for this specialized exemption and never informed Plaintiffs that it had been completed. Furthermore, it is inconceivable that all of the above-named bank officers ignored the fact that Mrs. Zuhovitzky's signature was absent from the form changing client's address.

*85.* Plaintiffs became aware of this form only in June 2017, when a copy was provided to their U.S. tax attorney from the IRS Office of Counsel during discovery related to the subsequent U.S. Tax Court Trial.

**UBS Cross-Border Business and Visits in Manhattan:**

*86.* During the years between 2000 and 2008, Marcel Beeler and other UBS bankers and employees met with Mr. Zuhovitzky, as part of the UBS U.S. cross-boarder business in Manhattan, NY.

87. UBS business records show that at least three occasions, August 20, 2001, March 30, 2006 and September 28, 2006 a UBS cross-border banker met with Mr. Zuhovitzky in Manhattan.

88. UBS business records show that during the years between 2000 and 2008, UBS bankers had numerous contacts with Mr. Zuhovitzky via phone, email or fax, averaging between 2-5 per month.

89. During the years between 2000 and 2008, Marcel Beeler and other UBS bankers and employees attempted to have Mr. Zuhovitzky agree to or finalize financial transactions while they were in Manhattan, NY.

90. Any official contact between UBS bankers and Mr. Zuhovitzky in NYC violated U.S. laws as acknowledged by UBS in a Deferred Prosecution Agreement.

91. UBS's own business records show that Mr. Zuhovitzky repeatedly rebuffed any attempts by UBS cross-border staff to engage in anything other than purely social interactions while in the United States.

92. Prior to setting up a meeting with Mr. Zuhovitzky, the UBS banker asked whether he wanted to receive any bank documents including bank statements in New York. He categorically refused at all times.

93. During the years between 2000 and 2010, Marcel Beeler and other UBS bankers and staff communicated with Mr. Zuhovitzky, whom they knew was in Manhattan, NY via telephone and fax.

**The United States, the John Doe Summons Case and the UBS Account:**

94. I On June 30, 2008 the United States filed a Petition in the Federal District Court for the Southern District of Florida, requesting leave to serve a "John Doe Summons" on UBS AG

demanding it provide information regarding an unknown number of accounts belonging to unidentified U.S. persons who between December 31, 2002 and December 31, 2007 had signature or other authority with respect to financial accounts maintained at UBS AG. On July 1, 2008, the Court issued an Order, granting that the IRS could serve the John Doe summons upon UBS.  FLSD Docket No: 08-21864-MC-Lenard/Garber.

**95.** On February 18, 2009, the Florida District Court approved a Deferred Prosecution Agreement ("DPA") between UBS and the United States, in which UBS admitted that it had engaged in criminal activities in violation of U.S. law. United States v UBS AG 09-60033-CR-Cohn (S.D.Fl).

**96.** UBS failed to respond or comply with the Summons and on February 19, 2009, the United States filed a Petition to enforce the John Doe Summons. See: Petition Document 1, United States v UBS AG Docket No. 1:09-cv-20423-ASG (S.D. Fl.)  Even before UBS filed a response, the Swiss Government jumped in to request permission to file an Amicus Brief on the matter. UBS's opposition to the Petition, as well as a number Amicus briefs, including that of the Swiss Government,  claimed that the U.S. efforts to obtain information about Swiss accounts through the summons process 1) violated the Swiss/American Tax Treaty, 2) that UBS would be in violation of Swiss law if UBS complied, and 3) that an Order to compel enforcement of the summons from a U.S. court would be inconsistent with international comity.

**97.** On July 7, 2009, the Swiss government filed an additional response which stated unequivocally that:

UBS is unable to comply with the summons without violating Swiss law.

The Government of Switzerland will use its legal authority to ensure that the

bank cannot be pressured to transmit the information illegally, including if necessary by issuing an order taking effective control of the data at UBS that is the subject of the summons and expressly prohibiting UBS from attempting to comply. When the Government of Switzerland issues such an order, it will be an "Act of State.

**98.** Thereafter the two governments engaged in negotiations and settlement talks which resulted in the filing, on August 19, 2009, of a stipulation of dismissal on the Court case because the two governments and UBS had come to Settlement Agreements. Thus, the release of account information by UBS was subject, not to an Order based on the John Doe Summons by a U.S. court but rather on an agreement between the U.S. and Swiss governments, pursuant to the terms of the Swiss/US Tax Treaty and a separate agreement, forced upon UBS by the two governments, between UBS and the IRS.

**99.** The United States, at no time, made a demand for data and information about any particular account as it did not possess such identifying information. The determination of which accounts should be released to the United States was made by UBS.

**100.** In order to comply with the Agreement between the U.S. and Switzerland and to meet due process requirements forced upon it by Swiss law, UBS was required to provide notice to any account holder whose account was being considered for release to the United States.

**101.** Due to the fraudulent actions of UBS's agents/employees and managers in 2005, Plaintiffs were never afforded the necessary notice of their due process rights because UBS sent the notice to an address, inserted by Mr. Beeler, that was not related to Plaintiff.

*102.*     UBS was quickly made aware of its mistake because it soon received the mailing back as undeliverable. Despite nearly constant contact with Plaintiffs, either by phone or in person in Zurich, UBS never made any further attempt to deliver this all-important notice and never mentioned that Plaintiffs account information had been forwarded for processing to release to the United States. UBS's actions also forfeited a second provision of the Settlement Agreement designed as an additional fail-safe to prevent the wrongful release of private banking information. UBS provided the same wrong address to the law firm which had been designated by the Swiss government to act as agent for any account holders who did not reply directly to the Notice sent by UBS. Thus, Plaintiffs were denied a second opportunity to prevent the release of the account information and data.

*103.*     The wrongful and illicit actions taken by UBS, its agents, and employees in 2005 were taken knowingly to further the interest of UBS and its agents and employees within its cross-border business in the United States, to which UBS has already conceded criminal conspiracy to defraud the United States and paid an $800 Million dollar penalty.

*104.*     UBS continued its fraudulent behavior towards Plaintiffs through at least 2019, and it is possibly ongoing, where UBS purposefully concealed the illicit actions of its agents/employees and failed to meet its duty to inform the client.

*105.*     UBS, in agreeing to become the arbiter of what accounts were released to the IRS, and in agreeing to provide notice to account holders as specified in the Settlement Agreement(s) (determined by the two governments to be required to provide due process rights under Swiss law and in accord with the Swiss/US Tax Treaty) took upon itself a fiduciary duty to protect the interest of its clients, at least with regard to the provisions provided within the requirements of the Agreements.

17

106.      UBS failed to inform plaintiffs about their decision to provide Plaintiff's bank information data to U.S. authorities. Such concealment denied Plaintiffs their right to prevent the wrongful release of the information to the United States Taxing Authority by UBS.

107.      In 2008, the United States government, through its Department of Justice and the IRS moved against UBS, alleging that UBS was engaged in fraudulent activities that were designed to assist United States taxpayers in committing tax fraud.

108.      On June 30th, 2008, the United States Justice Department asked the U.S. District Court for the Southern District of Florida to serve what is known as the "John Doe summons" on UBS to obtain information about possible accounts being held by United States persons whose identities were unknown.

109.      On July 1, 2008, the U.S. District Court for the Southern District of Florida issued an order to direct UBS to produce records identifying U.S. taxpayers with accounts at UBS in Switzerland.

110.      Thereafter, there was a heated legal battle which involved the United States on one side and UBS, and the Swiss Government, with an additional *Amicus Brief* submitted by the Institution of International Bankers, the International Bankers Association of California, the Swiss Bankers Association, the Swiss-American Chamber of Commerce and EconomieSuisse on the other side as to whether the John Doe summons should, or could, be enforced.

111.      The arguments from the UBS/Swiss side in that matter, focused on the fact that enforcement of the John Doe summons would violate the sovereignty of Swiss law and the

Swiss-U.S. Tax Treaty and would force UBS to violate both civil and criminal laws within Switzerland.

112.     It should be noted, that despite multiple media reports, and numerous federal case filings since that time, indicating differently, the John Doe Summons was never actually enforced.

113.     The release of account information was the result of carefully drafted settlement agreements between the United States and Swiss governments, and an agreement between UBS and the US IRS which proscribed the actions to be taken to respect the sovereignty of Swiss law and comply with the tax treaty between Switzerland and the United States while providing a pathway for UBS to comply with the provision of account information without being in violation of Swiss criminal and banking laws.

114.     Plaintiffs' lives were forever changed, and they were forced to endure over 10 years of international legal battles when UBS wrongly included Mrs. Zuhovitzky's account in the accounts released by UBS. UBS engaged in actions which denied her the ability to take advantage of the pre-release opportunities to protect herself which were carefully built into the agreements for just such cases and clients like herself.

115.     UBS's knowing failure to comply with the requirements of the Agreements was done wrongfully and illegally, in violation of Swiss Banking laws, Swiss criminal law, and in violation of the US/Swiss Tax Convention (the "Tax Treaty") of 1998.

116.     UBS documentation unequivocally identified Esther Zuhovitzky as the sole beneficial owner of the account.

117.     UBS documentation unequivocally identified Esther Zuhovitzky as a citizen of Austria and Israel.

118.    UBS documentation unequivocally stated that Jonathan Zuhovitzky was not a beneficial owner of the account and held only a Power of Attorney.

119.    The United States, through the IRS Office of Chief Counsel has conceded that Plaintiff Husband (a U.S. person) had no property rights over the assets in the UBS account.

120.    The United States, through the IRS Office of Chief Counsel has conceded that Plaintiff wife was never a citizen or resident of the United States.

**The Deferred Prosecution Agreement:**

121.    On February 18, 2009, pursuant to a criminal prosecution brought by the United States against UBS in the United States District Court for the Southern District of Florida, UBS signed a Deferred Prosecution Agreement (the "DPA) to forestall criminal prosecution on conspiracy to defraud the United States.

122.    Pursuant to Exhibit D of the DPA, UBS was required to send to all U.S. based clients a letter notifying them that: as of July 17, 2008, UBS publicly announced that it would no longer provide cross-border services to U.S. domiciled private clients through non-U.S. regulated entities, such as the UBS unit that was serving U.S. clients at that time.

123.    The letter notified clients that UBS would no longer be able to provide services through the current arrangement and that clients were being provided with notice to terminate their current banking relationship and all associated services and agreements with the client's master account number within 45 days from the date of the letter.

124.    It is important to note that Plaintiffs received *no such notice* from UBS or any of its subsidiaries, again evidencing Defendants' longstanding knowledge that Mrs. Zuhovitzky's account was not a "U.S. Related" account.

20

*125.*      Plaintiffs had no reason to be expecting such a notice, since Plaintiffs were always fully aware that Esther Zuhovitzky, as beneficial owner of the account, was not a U.S. person and therefore her banking relationship with UBS should not be affected by the US/Swiss/UBS conflagration.

**The John Doe Summons and the Swiss/US/UBS Agreements:**

*126.*      On August 19, 2009, Switzerland and the USA signed an agreement on an official request for assistance from the IRS regarding UBS ("UBS Agreement 09"). In this agreement, Switzerland undertook to process a request for administrative assistance from the USA regarding US clients of UBS on the basis of the criteria set out in the annex to the US/Swiss/UBS agreements.

*127.*      On the basis of the criteria set out in the annex, the contracting parties estimated and expected that around 4,450 current or netted accounts would fall under the administrative assistance request.

*128.*      With regard to such accounts, Switzerland through its Federal Taxing Authority ("FTA" or "SFTA") promised to ensure that a final ruling on the surrender of the requested information could be issued within a certain period of time after receipt of the request for administrative assistance.

*129.*      It was UBS's duty to identify US persons among its clients and make a list of the accounts. The IRS did not provide either Switzerland or UBS with names of account holders.

*130.*      In a separate agreement with the IRS, UBS undertook to comply with the FTA's ruling on the release of the information covered by the request for official assistance within the specified period after receipt of the notification from the FTA of the receipt of the request for official assistance from the IRS (hereinafter referred to as: Settlement Agreement).

*131.*     Under the terms of the Settlement Agreement, UBS was required to send notifications to all "US persons" whose accounts at UBS were subject to the administrative assistance request, as soon as such accounts were identified. UBS had to inform the account holders that they should immediately designate an authorized representative in Switzerland to receive notifications regarding the request from the United States concerning their accounts.

*132.*     On August 31, 2009, the IRS submitted a request for administrative assistance to the FTA, referring to the UBS Agreement 09.

*133.*     The IRS requested disclosure of information about American taxpayers who between January 1, 2001 and December 31, 2008 had the authority to sign or otherwise dispose of bank accounts with UBS for which UBS (1) did not hold a completed form "W-9", or  (2) did not possess the form "1099" in the name of the respective taxpayer.

*134.*     It should be noted that at no time that Plaintiff' wife's account was open did Plaintiffs receive any requests from UBS for either husband or wife to complete a WBEN-9, W-9, or 1099 form. This is further evidence of Defendants' long-term knowledge that this account was not held by a United States person.

**The UBS/U.S. Agreement**

*135.*     The UBS Agreement is a mutual agreement which falls under the control of the "Convention Between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income, (i.e. the "US/Swiss Tax Treaty") signed October 2, 1996 in Washington D.C. which provides for administrative assistance only in the case of tax fraud but not in the case of tax evasion.

136. The Agreement between the Swiss Confederation and the United States specifically stated that for indicated accounts UBS would "**provide notice to account holders under the Treaty request".**

137. Article 4 of the Agreement between the Swiss and the U.S. governments indicates that UBS, in a separate agreement between UBS and the IRS, committed to compliance with the Swiss/US agreement.

138. The Swiss/U.S. Agreement was signed by Guillaum Scheurer as Charge d'Affaires of Switzerland and Barry B. Shott as Deputy Commissioner of the Internal Revenue Service.

139. According to the UBS/US Settlement Agreement, "UBS agreed to send notices based on available contact information to U.S. persons whose accounts with UBS are subject to the Treaty Request informing such U.S. persons that they should promptly designate an agent in Switzerland for the receipt of communications concerning the Treaty Request with respect to their accounts as soon as such accounts are identified by UBS."

140. The form and content of such notice was included as Exhibit B to the UBS/US Settlement Agreement.

141. The proposed letter begins: "We have been informed that the U.S. Internal Revenue Service ("IRS") has submitted a request for administrative assistance to the Swiss Federal Tax Administration (the "SFTA"), pursuant to Article 26 of the 1996 Convention Between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income (the "1996 Convention"), seeking information with regard to accounts of certain U.S. persons owned either directly or through an offshore company that are or have been maintained with UBS AG ("UBS") in Switzerland. This letter provides notice

23

to you that your account with UBS appears to be within the scope of the above-referenced IRS request."

142.    As with the Notice required by the DPA, Plaintiffs did not receive any such a notice from UBS.

143.    As was the case with the Notice required by the DPA, Plaintiffs had no reason to expect such a letter and no reason to inquire if they should be on notice about such a letter, because Plaintiffs were always well aware that Mrs. Zuhovitzky was not a U.S person and therefore her banking relationship with UBS was not indicated in the fray between the United States and the Swiss banking industry.

144.    Plaintiffs also knew that as a long-term client of UBS, UBS had always been aware that Mrs. Zuhovitzky was neither a U.S. citizen nor a resident.

145.    The letter dated March 16, 2010, with the subject "NOTICE TO UBS ACCOUNT HOLDERS" contained the same language as proposed in the Settlement Agreement, and indication that UBS was under a legal duty to provide the notification in precisely the manner indicated by the Agreement.

146.    The letter indicates that the SFTA, pursuant to the IRS Treaty Request required that clients whose accounts were affected should, within 20 days, appoint a person to act as their agent and authorized to receive notifications in Switzerland. If help was needed in finding a person to act as agent, the letter provided the contact information for the Swiss Bar Association.

147.    The letter indicates that should the account holder not appoint an agent within 20 days of the date of the letter, then the SFTA would appoint the law firm of Bill, Isenegger, Ackerman AG, located in Zurich as agent for service of process for that account holder.

148.    The letter indicates that should the SFTA authorize the providing of information concerning an individual's UBS account to the IRS pursuant to the 1996 Convention (i.e., the Swiss/US Tax Treaty) the SFTA would notify the individual's agent in Switzerland and would advise about the right, under Swiss law, to appeal such a decision by the SFTA to the Swiss Federal Administrative Court.

149.    On March 16, 2010, UBS mailed the required letter addressed to Plaintiff, but - to an incorrect address, via registered mail.

150.    The letter was duly returned to UBS as undelivered. The address was incorrect precisely because of Mr. Beeler's unauthorized action in 2005 changing the address of the account from Zurich to Israel without the account owner's knowledge, consent or signature.

151.    It was only sometime in 2018, when Plaintiff's U.S. tax counsel came, in another matter, across a copy of the UBS "warning letter", that Plaintiffs were made aware that such a letter existed or that UBS had had a duty to notify any customers whose banking information it was considering providing to the IRS.

152.    After receiving the letter back as undelivered, UBS made absolutely *no attempt* to deliver this highly important and time sensitive letter or to inform Plaintiff by any other means, who has been in constant contact with the bank, of its existence.

153.    Despite the long relationship history and knowledge that the account holder was not a U.S. person, and despite frequent contacts, both in-person and by phone, with Plaintiffs and other POA's to the account, UBS representatives never once mentioned this critical and time sensitive piece of communication involving legal matters and the possible release of confidential banking information to a foreign government.

*154.*  UBS failed to notify Plaintiffs that it had sent a letter to 3 Daniel Frisch Street, Tel Aviv, Israel and ignored its return until Plaintiffs directly inquired of UBS through Swiss attorneys in 2018.

*155.*  It was only in response to a direct request about why UBS did not provide Plaintiffs with the requisite notice that UBS finally admitted it had sent the requisite notice to an incorrect and unrelated address on March 16, 2010.

*156.*  Even upon providing Plaintiffs notice that the required Notice had been sent, albeit to an incorrect address, UBS hid the fact that they knew Plaintiffs had no notice because the letter had not been delivered and was returned to UBS in Zurich on or about May 12, 2010.

*157.*  UBS had clear knowledge that they were in possession of the returned correspondence because they were able to produce it when directly challenged to do so.

*158.*  According to UBS's business records, Plaintiffs visited the branch office in Zurich on March 29, 2010, at which time, according to the records, Plaintiffs collected all mail being held. No mention of the most important Notice dated March 16, 2010 – mailed to Tel Aviv was made. No copy of such Notice was included in the retained mail nor anything handed by the account advisor to Plaintiffs.

*159.*  According to UBS's own business records, a telephone call was held on May 28, 2010, regarding the transfer of some funds. By this time, UBS had received the undelivered notice back. Again, no mention is made that an important legal notice has been sent and returned as undelivered on May 12, 2010, which required that account holder must timely take action in order to prevent the release of her banking information to a foreign government.

*160.*  According to UBS's own business records, Plaintiffs visited the bank on July 9, 2010. The Client Advisor, whose identity cannot be determined because the Plaintiffs' copy of the record

is redacted, submits a lengthy note about the Plaintiffs and their families' long history with UBS and how very pleased with the services of UBS they are.

161.    The mail being held for the account is noted to have been provided to the Plaintiffs and there is no mention of the Letter which by this time has been sent to Tel Aviv and has returned to UBS.

162.    It is clear that no mention of the errant letter was either provided to Plaintiffs or even mentioned at this in-person meeting as clearly Plaintiffs would not have thereafter reported being pleased with the services provided by UBS!

163.    According to UBS records, Plaintiffs again visited the Zurich branch on July 27, 2010, at which time mails were once again handed over with UBS failing to provide the Notice. Continuing throughout the 2010 year, Plaintiffs had several more interactions with UBS staff, both by phone and in person.

164.    No mention of the returned letter ever appeared in UBS own client contact record. No copy of the returned letter ever appeared in retained mail provided to the client.

165.    Plaintiffs had no means of knowing of the existence of the requisite Notice which was required to be sent by UBS on the conditions of the US/UBS Settlement Agreement.

166.    Plaintiffs also had no reason to believe that they should be on inquiry about whether such a Notice would relate to Mrs. Zuhovitzky's UBS account, because they had no reason to suspect that she would be treated as a U.S. account holder.

167.    It was only by serendipity that Plaintiffs found out, in 2018, that UBS had been required to provide notice to account holders prior to releasing their account information to the IRS by dint of the fact that Plaintiffs U.S Tax Counsel had other clients in similar cases who *had* received such notices from UBS.

168.   Even after admitting, in 2018, that it had sent Notice to the address at 3 Daniel Frisch Street, Tel Aviv in March 2010, UBS played coy and failed to admit that it was on notice that Plaintiffs had not been properly notified because it had received the Notice back by return mail.

169.   It took a written request, penned by Plaintiff Wife, who remains a client of UBS, to prise a copy of the letter from UBS in May of 2019 - some nine years later!

170.   Clearly UBS was aware that it had the Notice in its files all these years and could have easily provided it to Plaintiffs so that they might have taken action to protect their interests.

171.   If UBS had informed the plaintiff in a timely and dutiful manner (as it was required to do under the Agreement and Treaty Request), Plaintiffs would have been able to exercise the procedural rights to appeal to which they were entitled.

172.   As part of the procedural safeguards provided for in the Settlement Agreement, a Swiss law firm was named in the Letter. For any UBS customer whose account information was being considered for release to the U.S. government, this law firm was to be designated as "agent" to help protect client's rights.

173.   It has only recently been discovered that this Zurich law firm was indeed provided information from UBS regarding Mrs. Zuhovitzky's account information so as to be made her "agent" regarding whether her account information should be released to the United States.

174.   This law firm never successfully contacted Mrs. Zuhovitzky because the address provided to them by UBS was the same incorrect Tel Aviv address that Mr. Beeler had illegally placed into the UBS system years before. One should ask, why did UBS fail to simply provide the law firm the telephone numbers of Plaintiffs with whom UBS was in frequent telephone conversation.

*175.*   Thus, the actions of UBS directly denied Plaintiffs any and all opportunities to clarify Mrs. Zuhovitzky's non-U.S. status to the Swiss court and the Swiss authorities to which UBS erroneously passed client's information.

**Audit and Investigation by Internal Revenue Service**:

*176.*   Because of the information obtained from UBS regarding Esther Zuhovitzky's account, the United States IRS initiated an income tax audit in 2011, initially only for the year 2008, which was later expanded to cover tax years 2000-2008.  This audit, as Plaintiffs only found out a number of years later, was solely focused on purported failure to report income from the UBS account of Esther Zuhovitzky.

*177.*   Plaintiffs also learned that the auditor of the IRS stated that there were no deficiencies in Plaintiffs tax returns in any other income streams.

*178.*   During the income tax audit, the IRS also chose to pursue the assessment of a civil penalty against Jonathan Zuhovitzky for failing to include information about his wife's UBS account on his annual FBAR filings.

*179.*   Throughout the audit, IRS staff acted in a particularly aggressive manner, and refused to disclose the causes for initiating the audit.

*180.*   The history of bad press in the United States surrounding UBS and prior matters such as the criminal prosecution that led to the DPA, clearly fueled the IRS' ire and intentions to prosecute and punish Plaintiffs to the fullest, most Draconian extent possible.

*181.*   It seems that everywhere, an assumption exists that anyone who does business with an institution as criminal as UBS is guilty by association. This mindset made it much more difficult, complicated, and time consuming for Plaintiffs to prove their innocence on the tax and reporting issues.

*182.*   After extending the audit from one to nine years, the audit division then referred the case on Jonathan Zuhovitzky to the Criminal Investigation division of the IRS.

*183.*   Presumably no case on Mrs. Zuhovitzky was forwarded to the Criminal Investigation division because it was recognized that as a non-U.S. citizen or resident, she was not subject to U.S. laws governing criminal tax fraud.

*184.*   Plaintiff Jonathan Zuhovitzky was a highly regarded professional within the international banking and finance community. Being placed under an investigation for possible criminal tax fraud caused grave injury to his professional reputation and was instrumental in his decision to retire from the New York financial arena causing significant loss of income.

*185.*   The IRS Criminal Investigation Unit closed the investigation of Mr. Zuhovitzky with no findings and a recommendation that there was no cause for criminal prosecution. The report indicated that it was clear that Plaintiff Wife, the sole beneficial owner of the account, was an Austrian citizen and not a United States person, that she inherited the funds in the UBS account, and that no unreported U.S. income had ever been deposited into the account, i.e.. There was no probable cause for further criminal proceedings.

*186.*   On December 3, 2015, the IRS issued a Notice of Deficiency based on the audit. It demanded tax payments of USD 2,167,692.00 as well as penalties of USD 1,625,769.00 with additional interest that would have brought the total to nearly $7,500,000.00. A portion of the proposed penalties sought to attach penalties for civil fraud.

*187.*   This assessment was based exclusively on the income generated on UBS acct #8026 as this account was the only source of income considered under the audit.

*188.*   By analyzing UBS data provided by the IRS it is evident that UBS included statistical tables and spreadsheets that have never been shown to the account holder. Those documents

were relied upon by the IRS. Unfortunately, they did not conform to customary accounting practices for tax calculations in the United States. As a result, the Notice of Deficiency issued by the IRS were arbitrary and grossly inflated.

189.   The IRS auditor also assessed a proposed willful FBAR penalty against Mr. Zuhovitzky, in the amount of Five Million, One Hundred and Twenty-Three thousand ($5,123,000.00) dollars for failing to include information about his wife's account on his annual FBAR report filings.

190.   With the addition of "administrative penalties" and interest, the proposed FBAR penalty eventually reached an unconscionable $9.7 million.

191.   As with the criminal investigation, no FBAR penalty was proposed against Mrs. Zuhovitzky for not reporting her foreign account on an FBAR. Obviously, a foreigner, who is a non-U.S. person cannot be asked to report his or her foreign accounts to the U.S. authorities.

**Plaintiffs' U.S. Legal Battles:**

192.   Due to the wrongful provision of information about Mrs. Zuhovitzky 's UBS account, which absent UBS' fraudulent and concealing behavior would have been entirely avoided, Plaintiffs were forced to fight prolonged and costly court battles to clear their names, reputation and finances.

193.   Because UBS wrongfully provided the Plaintiffs account information in 2010, the IRS began an audit of Plaintiffs' tax reporting in 2012. It was unclear to Plaintiffs why the audit was initiated, what exactly the IRS was looking for and what was the source of any questionable information held by the IRS. The IRS refused to advise Plaintiffs that they received data from UBS and were looking specifically for income from the UBS account.

*194.*     It was only in mid-2017 that Plaintiff received from the IRS copies of the data which had been provided by UBS in 2010.

**Income Tax Case in the United States Tax Court:**

*195.*     Plaintiffs filed a Petition with the United States Tax Court, and the case was heard in July 2019 in New York, New York.

*196.*     After just over a day into trial, the government conceded that it could not bear the burden of proof to maintain allegation of fraudulent behavior on the part of Plaintiffs and it swiftly came to Plaintiffs' attorney requesting to settle the case.

*197.*     Although Plaintiffs wished to completely exonerate themselves on all tax issues, logistically they had to take into consideration the fact that an opinion from the Tax Court might take up to a year to be filed and the threat that the Government might seek an Appeal from any decision.

*198.*     Knowing that they still needed to bring suit over the outrageous $9.7 million FBAR penalty, the plaintiffs determined that it was in their best interest to be prudent and agree to a settlement provided it will be for a relatively small amount.

*199.*     For settlement purposes, Plaintiffs agreed to a baseline of selecting the two tax years which proposed the lowest IRS claims. Since the IRS numbers were never even analyzed by the parties, Plaintiffs proposed to agree on half of the IRS claims for each of those years. Unlike an actual tax obligation which carries automatic penalties, the proposed settlement amount were not subject to penalties. The government agreed to the proposed settlement on the spot.

**FBAR Case Within the Federal District Court for the Southern District of New York:**

200.   United States individuals are required to report interest or POA in foreign financial accounts that total over $10,000. Penalties for not reporting vary, a non-willful penalty is capped at $10,000 (whether per year or per financial account is currently before the Supreme Court) but "willful FBAR penalties" are either $100,000 or half of the amount in the account. Since the IRS can assess penalties for multiple years, it is possible for the penalty to rather quickly become more than was ever in the account.

201.   In Mr. Zuhovitzky's case, the account and the funds in the account were never his and he acted only as an investment adviser for his wife's account. Thus, the government was demanding that Mr. Zuhovitzky pay a multi-million dollar penalty using funds that never belonged to him.

202.   The United States Tax Court does not have jurisdiction to hear cases involving FBAR penalties.

203.   There is no meaningful administrative appeal for willful FBAR penalties totaling over $100,000 pre-assessment of the penalty.

204.   In most instances, a taxpayer who wishes to challenge a willful FBAR penalty must wait for the US government to bring suit in a Federal District Court to gain a judgment on the assessed penalty. The government has two years to bring suit.

205.   In the case of Mr. Zuhovitzky, although the penalty was assessed for more than $5 million dollars, the government failed to bring suit prior to the two-year statute of limitations.

206.   Despite never finalizing the FBAR penalty, the US government began to offset Mr. Zuhovitzky's social security payments by 15% each month.

207.   The Plaintiffs' only option for challenging the willful FBAR penalty assessed against Mr. Zuhovitzky was to bring suit against the U.S. Department of Justice, the U.S. Department of

Treasury, the IRS, and the individual auditor and her supervisor who assessed the penalty in the Federal District Court for the Southern District of New York in June 2020.

208.   By the time the suit was filed, the FBAR penalty, originally set at over $5 million dollars, had reached a staggering $10 million dollars by the addition of various "administrative penalties" and was accruing interest s at the rate of some $32,000 per month.

209.   By April 2021 the Government conceded the case based on fears that the FBAR penalty assessed against Mr. Zuhovitzky, who was not the owner of the account or the funds therein, would be determined to be unconstitutional under the Eighth Amendment's "excessive fines" clause.

210.   The Parties agreed to settle the case with ZERO due from Mr. Zuhovitzky.

**UBS's Admitted History of Fraud and Other Criminal Activities Meet RICO Standards:**

211.   UBS has been engaged in criminal RICO activities for decades, has been prosecuted by the United States numerous times and has publicly and legally admitted to such activities.

212.   The reason UBS has not been criminally convicted in the United States is because prosecution has historically resulted in UBS agreeing to pay hundreds of millions of dollars in penalties and throwing its U.S. and international clients into harm's way.

213.   A close look at cases in which UBS has been sued either by or in the United States for its fraudulent and criminal banking and financial activities shows well over a billion dollars paid by UBS to settle cases within the U.S. courts within the past decades.

214.   The harm and damages suffered by Plaintiffs in this matter are a direct result of UBS's actions to bolster its cross-border business within the United States which was the target of a criminal investigation by the U.S. Department of Justice and the IRS in 2008 and 2009.

215.    In February 2009, the United States filed a criminal information in the United States District Court for the Southern District of Florida, to which UBS, AG acquiesced.

216.    According to the Information, because of UBS's ownership of banks and investment brokerages in the United States, United States tax laws applied to UBS.

217.    According to the United States, the cross-border business employed approximately 60 private bankers, provided private banking services to approximately 20,000 United States clients and generated approximately $200 million a year in revenue for UBS.

218.    The United States lists as "unindicted co-conspirators not named as defendants" a number of UBS Executives, Managers, Desk Heads and Bankers.

219.    The United States asserted that Desk Heads "traveled to the United States to conduct unlicensed banking and investment advisory activity for UBS's United States clients.

220.    The United States asserted that UBS private bankers routinely traveled to the United States to conduct unlicensed banking and investment advisory activity.

221.    The Information asserts that "it was part and an object of the conspiracy that defendant UBS and its co-conspirators would and did increase the profits of UBS by providing unlicensed and unregistered banking services and investment advice within the United States."

222.    The Information asserts that as part of the conspiracy, defendant UBS, Executives, Managers, Desk Heads, and Bankers utilized nominee entities, encrypted laptops, numbered accounts, and other counter surveillance techniques to conceal the identities and offshore assets of United States clients from U.S. authorities.

223.    The Information asserts that as part of the conspiracy, UBS, Executive and Managers entered into a Qualified Intermediary (QI) agreement and represented to the IRS that UBS was in compliance with the terms of the QI Agreement, while knowing that the United States cross-

border business, was in fact not being conducted in a manner which complied with the QI Agreement.

224.    The Information asserts that as part of the conspiracy, UBS, Executives, and Managers mandated that Desk Heads and Bankers increase the United States cross-border business, knowing that this mandate would cause Bankers and Desk Heads to have increased, unlicensed contacts with the United States in violation of United States law and the QI agreement.

225.    The Information asserts that as part of the conspiracy, the Executives and Managers put in place monetary incentives that rewarded Desk Heads and Bankers who increased the United States cross-border business.

226.    The Information asserts that as part of the conspiracy, Managers, Desk Heads, and Bankers provided unlicensed and unregistered banking services and investment advice to United States clients while in the United States and by mailings, email, and telephone calls to and from the United States.

227.    The Information asserts that as part of the conspiracy, when approached about the continuous unregistered and unlicensed contacts associated with the United States cross-border business, defendant UBS and Executives refused to implement effective restrictions because the business was too profitable for UBS.

228.    UBS agreed to the filing of the single count Information which charged that "UBS did unlawfully, willfully and knowingly, combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service of the United States Department of Treasury in the ascertainment, computation, assessment and collection of federal income taxes.

36

229.   The information asserts the following overt acts committed in furtherance of the conspiracy and UBS admitted to same:

    a.   On or about July 6, 2000, a manager authorized Bankers to refer United States clients to outside lawyers and accountants to create offshore structures to conceal from the IRS United States client's UBS accounts, while knowing that creating these structures constituted helping the United States clients commit tax evasion.

    b.   On or about July 14, 2000, Managers changed the wording on UBS Document 61393, "Declaration for US Taxable Persons", from "I would like to avoid disclosure of my identity to the US IRS to "I consent to the new tax regulations…" after United States clients expressed fears that the form as originally drafted could be used as evidence against them for tax evasion.

    c.   On or about July 11, 2002, a Manager and others instructed Bankers to tell United States clients who were contemplating transferring their assets to another offshore bank that UBS has the largest number of United States clients among all banks outside the United States, creates jobs in the United States, has better lobbying possibilities in the United States than any other foreign bank and would not be pressured by the United States authorities to disclose the client's identities.

    d.   On or about September 19, 2002, Executives on UBS's executive board knowingly failed to disclose to the IRS deficiencies in implementing UBS's requirements to report and withhold taxes for clients of the United States cross-border business that were discovered after the completion of an internal audit.

e. On or about September 26, 2002, a Desk Head instructed Bankers that if they have unauthorized contact with United States clients in the United States, that the Bankers should not report the contact in UBS's internal computer system.

f. In or about December 2002, Executives authorized Managers, to institute a temporary five-month travel ban to the United States. The ban coincided with an IRS initiative relating to identifying holders of offshore credit cards.

g. On or about January 22, 2003, after being advised by outside lawyers to take immediate action in order to build a defense against a possible future criminal case brought against UBS, a Manager instructed another Manager to limit written communications relating to offshore structures created for United States clients and instructed that Manager to begin issuing Form 1099 information to clients, but not to the IRS, for certain UBS accounts where UBS officials served as a manager for the offshore structures.

h. On or about January 24, 2003, Managers issued a form letter to United States clients, reminding them that since at least 1939 UBS has been successful in concealing account holder identities from United States authorities and that even after UBS's presence in the United States recently increased after the purchase of a large United States brokerage firm, UBS was still dedicated to the protection of their identities.

i. On or about July 9, 2004, UBS represented to the IRS that its United States based operations had failed to provide Form 1099 information to the IRS, failed to withhold the appropriate tax when required to do so, and failed to properly document the owners of certain accounts, but failed to inform the IRS that the

United States cross-border business continued to fail to provide Form 1099 information to the IRS, continued to fail to withhold the appropriate tax when required to do so, and continued to fail to properly document the owners of certain accounts.

j.  On or about August 17, 2004, Managers organized a meeting in Switzerland with outside lawyers and accountants to discuss the creation of structures and other vehicles for clients who wanted to conceal their UBS accounts and income derived there from tax authorities in the United States and Canada.

k.  In or about September 2004, Desk Heads and Bankers received training in Switzerland on how to avoid detection by authorities when traveling in the United States on UBS business.

l.  During calendar year 2004, approximately 32 Bankers traveled to the United States and met with United States clients approximately 3,800 times to provide unlicensed and unregistered banking services and investment advice relating to the client's UBS account.

m.  On or about April 25, 2005, Executives instructed Managers, Desk Heads, and Bankers to grow the United States cross-border business.

n.  In or about early December 2005, Desk Heads and Bankers solicited new business from existing and prospective United States clients at Art Basel Miami Beach in Miami Beach, Florida.

o.  On or about March 31, 2006, Executives enacted restrictions that were designed to have "little" or "some impact" on the profitability of the United States cross-border business.

p.  In or about August 2006, Executives refused to approve the recommendations of Managers to wind down, sell, or spin off the United States cross-border business, as too costly and requiring public disclosures that would harm UBS.

q.  On or about September 26, 2006, Desk Heads and Bankers were trained at UBS on how to conduct business discreetly by using mail that would not show UBS's name and address, by changing hotels while traveling, and by using encrypted laptop computers while traveling to the United States on UBS business and when meeting with United States clients. `

230.    The United States asserted that all of the above acts were in violation of Title 18, United States Code, Section 371, Conspiracy to Defraud the United States.

231.    On February 11, 2009, at a duly held meeting, the Board of Directors of UBS AG ("UBS" or the "Company") resolved as follows:

> The Company (i) consent to the filing in the United States District Court for the Southern District of Florida of an Information charging the Company with one count of participating in a conspiracy in violation of 18 U.S.C. §371 to defraud the United States and its agency the Internal Revenue Service in connection with the conduct of its U.S. cross-border business as set forth more fully in the Information, AND (ii) that the Company agrees to pay an amount no greater than $780 million in connection with the execution of the agreement described in paragraph 2 below and to execute the ongoing obligations described therein;

**Details of the Deferred Prosecution Agreement:**

232.    On February 18, 2009, the United States Department of Justice Tax Division, the United States Attorney's Office for the Southern District of Florida and UBS AG ("UBS")

entered into and filed the Deferred Prosecution Agreement (the "DPA") in which UBS waived indictment and consented to the filing of a one count criminal Information.

233.     In the DPA, UBS acknowledged and accepted its responsibility for violation of United States law.

234.     In the DPA, UBS accepted as true the facts as set forth in the Statement of Facts.

235.     UBS conceded that "beginning in 2000 and continuing until 2007, UBS through certain private bankers and managers in the United States cross-border business, participated in a scheme to defraud the United States and its agency, the IRS, by actively assisting or otherwise facilitating a number of United States individual taxpayers in establishing accounts at UBS in a manner designed to conceal the United States' taxpayers' ownership or beneficial interest in these accounts.

236.     Pursuant to the DPA, UBS agreed to pay Seven Hundred and Eighty Million dollars ($780,000,000.00) (the Settlement Amount) to the United States. This amount included Three Hundred and Eighty Million ($380,000,000.00) in disgorgement of wrongful profits earned from the United States cross-border business between 2001 through 2008.

237.     UBS acknowledged and accepted as true the following facts as set forth in the Statement of Facts:

a.   UBS AG acknowledged and accepted that it is a corporation organized under the laws of Switzerland that operates a global financial services business that provides banking, wealth management, asset management and investment banking services around the globe, including within the United States.

b.   UBS acknowledged and accepted that for some time prior to the Agreement, it had been operating a U.S. cross-border business through which its private bankers

provided securities related and investment advisory services to U.S. resident private clients who maintained accounts at UBS.

c.  UBS acknowledged and accepted that it was not registered as a broker-dealer or an investment adviser pursuant to the Securities Exchange Act of 1934 and the Investment Advisers Act of 1940, and that its private bankers and managers engaged in this U.S. cross-border business were not affiliated with a registered broker-dealer or investment adviser.

d.  UBS acknowledged and accepted that pursuant to the Securities Exchange Act and the Investment Advisers Act, that because their employees and agents were not duly registered,  UBS and those engaged in its cross-border business were restricted in what actions they could engage in with U.S. private clients, either while in the United States or by using U.S. jurisdictional means such as telephone, fax, mail, or email, including the provision of investment advice and the soliciting of securities orders.

e.  UBS acknowledged and accepted that during the relevant time period from 2001 through 2007, UBS private bankers in this U.S. cross-border business traveled to the United States to meet with certain U.S. private clients, and communicated by telephone, fax, mail and/or email with such U.S. private clients while those clients were in the United States.

f.  UBS acknowledged and accepted that during the period beginning in 2000 and continuing until 2007, UBS, through certain private bankers and managers in the U.S. cross-border business, participated in a scheme to defraud the United States and its agency, the IRS.

g.   UBS acknowledged and accepted that its private bankers and managers actively assisted or otherwise facilitated certain U.S. taxpayers, who such private bankers and managers knew or should have known were evading United States taxes, by meeting with such clients in the United States and communicating with them via U.S. jurisdictional means on a regular and recurring basis.

h.   UBS acknowledged and accepted that certain of its executives and managers continued to operate and expand the U.S. cross-border business because of its profitability.

i.   UBS acknowledged that it delayed the decision to wind down the U.S. cross-border business due to concerns that it would be costly, that it was not likely a third-party buyer of the business could be found, and because it could damage UBS's business reputation.

j.   UBS acknowledged and accepted that, in or about 2004, UBS Wealth Management International business changed its compensation approach to take account of a number of factors, including net new money, return on assets, net revenue, direct costs and assets under management, ***with weightings varying depending on the particular geographic market involved****. Emphasis added*

k.   UBS acknowledged and accepted that   following the above change in compensation, the managers of the U.S. cross-border business implemented this new compensation structure in a way that provided incentives for U.S. cross-border private bankers to expand the size of the U.S. cross-border business, thus encouraging those private bankers to have increased contacts with clients in the

United States via travel to the United States and via telephone, fax, mail and/or email.

238.     As part of its compliance with the DPA, UBS agreed to implement an "Exit Program" which required UBS to send an Information Letter to United States account holders indicating that UBS would no longer serve those clients and would be closing those accounts.

239.     It should be noted that the above named information letter was never given to Mrs. Zuhovitzky, the beneficial owner of the account or to Mr. Zuhovitzky, who held a power of attorney to the account.

240.     Throughout the years that UBS was involved with trying to maintain its cross-border business, Mrs. Zuhovitzky received none of the correspondence that UBS was required send to U.S. account holders. This is consistent with Plaintiffs assertion that UBS was always aware that Mrs. Zuhovitzky and her account were not "U.S. related".

**Further U.S. Legal Actions Against Defendants for Fraud and RICO Activities:**

**SEC v. UBS**

241.     In May 2011, the United States Securities and Exchange Commission (the "SEC") filed a complaint against Defendant UBS Financial Services alleging that UBS Financial Services engaged in fraudulent bidding practices involving the temporary investment of proceeds from the sale of tax-exempt municipal securities in certain reinvestment products by state and local government entities in the United States.

242.     The SEC alleged that UBS Financial Services engaged in fraudulent practices and made misrepresentations, rigging at least one hundred transactions, generating millions of

dollars in ill-gotten gains, and threatening the tax status of over $16.5 billion underlying municipal securities.

243.     In the above SEC Matter, UBS Financial Services and all its agents, servants, employees, and attorneys were enjoined from violating directly or indirectly Section 15(c) of the Securities and Exchange Act of 1934 by using any instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of securities by means of a manipulative, deceptive or other fraudulent device or contrivance.

244.   UBS Financial Services paid some $47 million dollars in fines and penalties in this matter, including disgorgement of $9,606,543.00 representing profits gained as a result of the conduct alleged in the Complaint, prejudgment interest in the amount of $5,100,637.00 and a civil penalty in the amount of $32,500,000.00.

**U.S. v. UBS Japan:**

245.     In 2012, the United States filed a criminal Information against UBS, Japan (another wholly owned subsidiary of UBS AG) alleging that between 2006 and at least 2009, UBS Securities Japan unlawfully, willfully, and knowingly devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises and did transmit and cause to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the executing of such scheme and artifice, to wit the defendants (UBS Japan) devised and engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates.

45

246.     In the above Matter, UBS Japan entered into a Plea Agreement, admitting the behaviors charged and agreeing to pay a fine of $100 million dollars.

**Plaintiffs' Damages are a Direct Result of Defendants Fraudulent Activities Undertaken as Part and Parcel of Ongoing Violations of the RICO Act**

247.     Due to UBS's wrongful actions directly related to Plaintiff wife's account, Plaintiffs have been forced to face a decade of legal battles on two continents rather than being able to focus on work, family matters, or even the simple joys of retirement.

248.     The wrongful disclosure of Mrs. Zuhovtizky's banking details caused by the fraudulent actions of UBS in 2010, forced the plaintiffs to face off in legal battles against the largest government on the planet and its taxing authority.

249.     Beyond the financial damages caused, Plaintiffs are elderly, and the fear and stress of having to fight pitched legal battles with the largest government in the world has caused irreparable physical and emotional health issues as well as placing almost unbearable stress upon their relationships.

250.     It is clear that in 2005, UBS manipulated the address they listed for Mrs. Zuhovitzky's account in order to hold it within their North-American division so that UBS bankers could generate greater revenue through the "cross-border" business within the United States.

251.     In late 2004, Plaintiff Wife, the account holder, requested that her account be listed with an address at her Zurich apartment- this address took effect in January 2005.

252.     Within months, the UBS customer adviser unilaterally, with no direction from the customer and without her knowledge or signature, changed the address for the account to an address in Tel Aviv, Israel which has never been associated with the account holder.

253.     Following this unrequested change of address, the customer adviser, in August 2005, then caused a PEP/SCAP exception to be applied to the account so that UBS could maintain in the North-American NE unit.

254.     The change of address and completion of the PEP/SCAP exception constitute actions, particular to this one client's account, that are but a miniscule part of UBS's broader actions at that time designed to fraudulently promote UBS's cross-border business which UBS has admitted were in violation of US law and part of a conspiracy to defraud the United States.

255.     UBS's actions in 2005, had serious further direct consequences when UBS, in 2010, sent a required Notice to this wrong address, which was only in UBS's system due to the actions of its agent/employee.

256.     UBS compounded the harms caused when it received the Notice returned as "undeliverable" and thereby had actual notice that it had not met its duty to provide notice pursuant to the agreements signed between the US/Swiss governments and UBS and the IRS- but made no further attempts to deliver the Notice either by mail or in person, or to notify the client by any means.

257.     The fraudulent actions and concealment by UBS are the direct cause of denying Plaintiffs due process rights guaranteed to them by Swiss law and carefully incorporated into the US/Swiss and UBS/IRS agreements.

258.     Had Plaintiffs been timely notified that Mrs. Zuhovitzky's account was under consideration for release to the United States, Plaintiffs could have successfully mounted an appeal to prevent such release. (As a sidenote, a Swiss judge in a related matter, has remarked that: given that the United States government admitted in a prior U.S. Court

proceeding that Mrs. Zuhovitzky was never a U.S. citizen or resident, the probability that Plaintiffs could have proven to a Swiss reviewing agency or Court would find that her account information should not be disclosed was high.)

259.     The completely unfounded allegations of tax fraud and dishonesty, coupled with being placed under a criminal tax investigation, irreparably tainted Mr. Zuhovitzky's professional reputation causing him financial harm from lost revenue.

260.     During the tax audit on the part of the IRS and the subsequent litigation before the United States Tax Court, Plaintiffs were forced to rely on extensive legal services from specialized tax attorneys, as well as the services of several accountants and financial experts were necessary in order to carry out a detailed analysis of their more than ten years of banking history and of their activities.

261.     During the lawsuit to challenge the wrongful FBAR penalty against Mr. Zuhovitzky, Plaintiffs were again, forced to rely on extensive legal services from specialized tax attorneys to defend their names, financial resources and reputations.

262.     The costs of the actions which Plaintiffs were forced to take to protect their interests have exceeded some $700,000 to date.

263.     The costs of the loss of business opportunities and revenue to Plaintiff Husband based on harm caused to his professional reputation as well as the excessive demands on his time and energy to marshal the legal and accounting resources and review family financial history that was needed to fight these battles have averaged some $150,000 per year for a decade for an estimated loss of $1,500,000.00.

264.     Defendants' fraudulent actions have caused untold damages for pain and suffering, emotional distress, impairment to physical health and damage to family relationships which shall be left for the jury to determine but in no case shall be less than $2.5 million dollars.

## AS AND FOR A FIRST CAUSE OF ACTION
## 18 U.S.C. § 1961 *et seq.* )
### Racketeer Influenced and Corrupt Organizations Act as to All Defendants)

265.     Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

*Factual allegations common to all RICO Counts:*

266.     Upon information and belief, for all relevant periods, Defendant UBS AG is the parent company of all Defendants. All UBS subsidiaries are "wholly-owned" and controlled by UBS AG. UBS AG acted as the controlling entity of each and all co-Defendants and as the "brains" of the association as part of an enterprise existing for the purpose of committing such racketeering and fraudulent actions against numerous victims, including but not limited to the Plaintiffs, as described herein.

267.     Defendants' RICO violations affected interstate commerce and were effected by the use of the mails, wires, and/or other instrumentalities of interstate commerce.

*Plaintiffs' Standing Under RICO:*

268.     Plaintiffs are persons within the meaning of 18 U.S.C. §§1961(3) and 1962.

269.     Plaintiffs have sustained an injury to their business or property by the conduct constituting Defendants' RICO violations as alleged and demonstrated throughout this Complaint.

270.     The Defendants' RICO violations did in fact cause Plaintiffs' injuries as the direct, intended result of the Defendants' scheme to defraud the Plaintiffs as alleged and demonstrated throughout this Complaint.

271.     The Defendants' RICO violations proximately caused Plaintiffs' injuries as the direct, intended result of the Defendants' scheme to defraud the Plaintiffs as alleged and demonstrated throughout this Complaint.

**Culpable Persons:**

272.     Defendant UBS AG CHE 101.329.562 as a corporation is a "person" within the meaning of 18 U.S.C. §1961(3).

273.     Defendant UBS AG CHE 412.669.376 as a corporation is a person within the meaning of 18 U.S.C. §1961(3).

274.     Defendant UBS SECURITIES LLC as a limited liability company is a person within the meaning of 18 U.S.C. §1961(3).

275.     Defendant UBS FINANCIAL SERVICES INC. as a corporation is a person within the meaning of 18 U.S.C. §1961(3).

276.     Defendant UBS ASSET MANAGEMENT (US) INC as a corporation is a person within the meaning of 18 U.S.C. §1961(3).

**Scienter:**

277.     The Defendants have admitted an intention to conspire to defraud the United States, see the 2009 DPA, including through the use of mail, wire etc. The Defendants intended to defraud Plaintiffs by obtaining Plaintiffs' property (money) by means of materially false

or fraudulent pretenses or representations which were part of the much broader endeavor of fraud to be perpetrated upon the United States and Defendants' own "U.S. Persons" customers.

278.    The Defendants' intent within the broader scope of the RICO endeavor is evidenced by Defendants admissions that they conspired to defraud the United States by encouraging customers to illegally avoid paying taxes on the income earned through UBS accounts. The Defendants defrauded such U.S. customers by lying to account holders regarding the privacy of their bank data and the legality of actions suggested, implemented, and managed by Defendants. Defendants intention to include Plaintiffs within the broader criminal scheme include without limitation the illicit and fraudulent change of address for the account followed by the creation of the fraudulent PEP/SCAP Exemption form, designed to allow Defendants to profit by holding Plaintiff Wife's account within the more profitable U.S. cross-border division rather than within the domestic Swiss division, making the materially false representations to Plaintiffs as described above, refusing to provide documents relevant to the account, and practicing similar schemes within the larger RICO enterprise and actions.

279.    Defendants intended to obtain Plaintiffs' property in the form of higher account fees and revenues by means of materially false or fraudulent pretenses or representations.

280.    Defendants' intent is evidenced by such examples as include without limitation its wrongfully making changes to Plaintiffs' account without permission or authority to do so and concealment of its malfeasance from Plaintiffs.

*Racketeering Activity—18 U.S.C. §1341, 18 U.S.C. §1343, and 18 U.S.C. §1344:*

281.     The Defendants conspired and participated in the commission of one or more racketeering activities within the definition of 18 U.S.C. §1961(1), including without limitation mail fraud, wire fraud, financial institution fraud, and conspiracy to defraud the United States.

282.     Specifically, Marcel Beeler and the team of UBS bankers on behalf of Defendants, committed mail and/or wire fraud by contacting Plaintiff Husband via telephone and fax numerous times per month during the years 2000-2008 to engage in banking transaction that they were not legally authorized to do within the United States by means of the mails and/or electronic mails, including without limitation representations regarding the investments and status of the Account.

283.     Further, Defendants within the Zurich office, on behalf of themselves committed mail and/or wire fraud by making use of the mails and/or electronic mail to send important legal notices with international implications to an address which they, themselves had falsified with the intention that Defendants could obtain Plaintiffs' money by false and fraudulent pretenses, representations, and promises.

284.     By way of example but without limitation, on or about July 27, 2005, Marcel Beeler, on behalf of Defendants, without any authorization of the account holder, summarily caused a change of address for the account to be entered into UBS computers. In October 2005, Defendants used the above address change to illicitly, and for the benefit of Defendants, move the account to management under the UBS division involved in the U.S. Cross-Border business.

285.    In 2010, when ordered by the Swiss government to comply with the Notice requirements of the US/Swiss Settlement Agreement, UBS utilized the mail system to send an important legal notice to a false address, knowing that it would not be received by the account holder. This misdirected communication through the channels and instrumentalities of interstate commerce denied Plaintiffs notice of impending harm and falsely provided Plaintiffs with the assurance that all was well with the account and that Defendants were protecting Plaintiffs legal and financial interests in the appropriate manner in furtherance of the Defendants' to be enriched unjustifiably through maintaining Plaintiff's account within the US cross-border business and continuing to operate the broader criminal enterprise which was the US Cross-border Business.

286.    Still further, Beeler or other UBS staff, on behalf of Defendants committed mail, wire, and/or financial institution fraud by accepting the undelivered notice when it was returned to UBS and thereafter failing to make any other attempt to deliver said Notice so that Defendants could obtain Plaintiffs' money by false and fraudulent pretenses, representations, and promises as well as to protect and support the broader criminal enterprise which was the US Cross-border Business.

287.    The Defendants then used Plaintiffs' money to enrich themselves and their enterprise by means of an enhanced benefits package for employees within the US Cross-border Business as well as enriching the US Cross-border business itself.

288.    Based on the foregoing, the Defendants devised and/or intended to devise one or more schemes or artifices to defraud Plaintiffs and others.

*289.*     Based on the foregoing, the Defendants devised and/or intended to devise one or more schemes or artifices for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

*290.*     Based on the foregoing, the Defendants did or could have reasonably foreseen the use of the mails in furtherance of their schemes or artifices to defraud Plaintiffs.

*291.*     Based on the foregoing, the Defendants did in fact use the mails in furtherance of their schemes or artifices to defraud Plaintiff.

*292.*     Based on the foregoing, the Defendants transmitted or caused to be transmitted by means of wire, radio, and/or television communication in interstate or foreign commerce, writings, signs, signals, pictures, and/or sounds for the purpose of executing such scheme or artifice.

*293.*     Based on the foregoing, the Defendants knowingly executed or attempted to execute a scheme or artifice to obtain Plaintiffs' property under the custody or control of a financial institution by means of false or fraudulent pretenses, representations, or promises.

**Pattern of Racketeering:**

*294.*     The Defendants committed not less than two acts of racketeering activity, one or more of which occurred within ten years after the commission of a prior act of racketeering.

*295.*     First, Defendants, through their agent Marcel Beeler and others committed the predicate acts of racketeering activity as alleged in detail above in direct relationship to Plaintiffs and Plaintiff Wife's account by a) fraudulently changing the address related to the account to Israel and b) fraudulently causing a PEP/SCAP Exemption to be placed on

the account thereby allowing UBS to service the account through its North-American divisions as part of its US Cross-border business rather than being held in UBS's domestic division with an address is Zurich.

296.    Further, as reported in the Deferred Prosecution Agreement, filed with the Federal District Court for the Southern District of Florida on February 18, 2009, Defendants conceded to a one count criminal Information and admitted to a conspiracy to defraud the United States through the activities of its US Cross-border Business.

297.    As part of the above DPA, Defendants conceded that UBS did unlawfully, willfully and knowingly, combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service of the United States Department of Treasury in the ascertainment, computation, assessment and collection of federal income taxes.

298.    As part of the above DPA, Defendants conceded that as part of its US Cross-border Business provided unlicensed and unregistered banking services and investment advice to United States clients while in the United States and by mailings, email, and telephone calls to and from the United States

299.    As part of the above DPA, Defendants conceded that On or about September 26, 2002, a Desk Head instructed Bankers that if they have unauthorized contact with United States clients in the United States, that the Bankers should not report the contact in UBS's internal computer system.

300.    As part of the above DPA, Defendants conceded that during calendar year 2004, approximately 32 Bankers traveled to the United States and met with United States clients

approximately 3,800 times to provide unlicensed and unregistered banking services and investment advice relating to the client's UBS account.

301.     As part of the DPA, Defendants conceded that on or about April 25, 2005, Executives instructed Managers, Desk Heads, and Bankers to grow the United States cross-border business.

302.     As part of the DPA, Defendants conceded that on or about August 2006, UBS Executives refused to approve the recommendations of Managers to wind down, sell, or spin off the United States cross-border business, as too costly and requiring public disclosures that would harm UBS

303.     As part of the DPA, Defendants conceded that on or about September 26, 2006, Desk Heads and Bankers were trained at UBS on how to conduct business discreetly by using mail that would not show UBS's name and address, by changing hotels while traveling, and by using encrypted laptop computers while traveling to the United States on UBS business and when meeting with United States clients.

304.     Defendants' pattern of racketeering constitutes a continuous and related series of acts forming a scheme with distinct actions against the instant Plaintiffs, by unlawfully obtaining the Plaintiffs' monies and using it for their own gain as part of their larger, scheme to defraud a global parade of victims in schemes similar to the one perpetrated on the instant Plaintiffs. Further, the Defendants continue to hold, invest, and otherwise make use of Plaintiffs' money as part of their ongoing enterprise and scheme and continuously harm Plaintiff as part of an ongoing enterprise.

**RICO Enterprise:**

305.     The Defendants constitute a group associated in fact and involved in interstate commerce.

306.     The Defendants' group functions to fulfill the purpose of, *inter alia*, deceiving innocent investors, including without limitation Plaintiffs and other aggrieved parties, into believing that they are *bona fide*, successful financial professionals, operating within the bounds of the laws in the jurisdictions in which they operate and persuading said investors to deposit or wire their money for the purpose of purchasing investment decisions while in realty operating outside the legal bounds of the jurisdiction and endangering customer's assets in real property to an attorney escrow account; inducing the escrow agent

307.     This association in fact has gone on for years, across the globe, swindling victims that include governments, municipalities and individuals, demonstrating a longevity sufficient to permit those associates to pursue the enterprise's purpose, as described above.

**Count One—§1962(a)**

308.     The Defendants as an ongoing enterprise received the benefit of the income of the funds taken from Plaintiffs and other victims in acts of racketeering as described above and invested said income into Defendants corporate structures and assets thereby benefiting Defendants while harming their victims.

309.     The Defendants received income in the form of Plaintiffs' money as well as investment monies from other victims, as well as enhanced fees for service. Defendants have admitted to fraudulently marketing products as viable and good investments, which

they knew were inherently risky to remove them from Defendants' books and to make customers bear the risk.

*310.*     The Defendants used and invested such income in the furtherance of the US Cross-border business and other illicit enterprise(s) which engaged in, or the activities of which affect, interstate or foreign commerce.

*311.*     The Defendants' engagement in and effect on interstate commerce includes without limitation their use of the mails, electronic mail, and bank wires in furtherance of their racketeering activity.

*312.*     Plaintiffs were injured by the investment of racketeering income including without limitation by the Defendants' using racketeering income to further grow their illegal U.S. Cross-border business leading Defendants' employees and agents to grow increasingly bold in their illicit behaviors, including but not limited to forging client documents.

*313.*     The Defendants accomplished the foregoing by the use of one or more racketeering activities within the meaning of 18 U.S.C. §1961(1) as described herein.

*314.*     The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) as described herein.

*315.*     As direct and proximate result of the Count I Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property including without limitation in that they have lost a minimum of $700,000 in legal and other professional fees necessary to defend themselves in legal actions as well as a minimum of $1,500,000.00 in lost revenues all directly caused by Defendants' harm.

*316.*        Wherefore, Plaintiff requests that this Court enter judgment against the Defendants as follows: actual damages caused by RICO activity in an amount to be determined at trial but in any event not less than $2,200,000.00, treble damages, and attorney's fees.

**Count Two—§1962(b)**

*317.*        Plaintiffs were injured by the acquisition of an interest or control over an enterprise.

*318.*        The Defendants' engagement in and effect on interstate commerce includes without limitation their use of the mails, electronic mail, and bank wires in furtherance of their racketeering activity.

*319.*        The Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity.

*320.*        Specifically, the Defendants took the capital investments of the Plaintiffs and others, obtained by Defendants through the sending of fraudulent documents and communications through the mails and/or electronic mail and thereafter fraudulently inducing Plaintiffs and other victims to invest funds with Defendants in a manner that benefited Defendants while harming Plaintiffs and other victims.  Defendants practiced variations of this scheme upon other victims, and thereby invested the proceeds of their racketeering offenses against their victims and used said proceeds to acquire, maintain, and grow an enterprise engaged in racketeering.

*321.*        The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) as described herein.

322.     The Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

323.     As direct and proximate result of the Count I Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property including without limitation in that they have lost a minimum of $700,000 in legal and other professional fees necessary to defend themselves in legal actions as well as a minimum of $1,500,000.00 in lost revenues all directly caused by Defendants' harm

324.     Wherefore, Plaintiff requests that this Court enter judgment against the Defendants as follows: actual damages caused by Defendants' RICO activity in an amount to be determined at trial but in any event not less than $2,200,000.00, treble damages, and attorney's fees.

**Count Three—§1962(d)**

325.     As set forth above, the Defendants have agreed and conspired to violate 18 U.S.C. § 1962(a) and (b). Specifically, the Defendants have admitted to conspiring to defraud the United States government by means utilizing financial institutions, the mails, wire and fax. Specifically, Defendants have operated their US Cross-border business in violation of U.S. law by facilitating unlicensed and unregistered bankers and brokers to travel to the United States and engage with persons within the United States without the necessary authority.

326.     Defendants' actions against Plaintiffs in the instant matter included visitation by the above mentioned unlicensed and unregistered bankers within the United States and use

of the mails, wire and fax to communicate with Plaintiff Husband while they knew he was in the United States.

327.      Defendants' actions specific to Plaintiffs include the Defendants fraudulent changing of the address related to the account such that Defendants could service the account from within the US Cross-border Business division which garnered higher revenues for Defendants.

328.      Defendants' actions specific to Plaintiffs include mailing a vitally important and time sensitive legal document to the false address that Defendants had assigned to the account and then hiding from Plaintiffs the fact that Defendants had actual knowledge that the document was never delivered.

329.      Defendants conspired to continue take the investments of the Plaintiffs and to continue to service their account in a manner that violated U.S. law in a manner that benefitted Defendants but created substantial risk of harm to Plaintiffs.   Defendants practiced variations of this scheme upon other victims, and thereafter invested the proceeds of their racketeering offenses in a manner that served to acquire, maintain, and grow an enterprise engaged in ongoing racketeering.

330.      Plaintiffs were injured by an overt predicate act of racketeering in furtherance of Defendants' conspiracy.

331.      This conspiracy is evidenced by the concerted actions taken by the Defendants and was intended to and did  (1) use or invest income that was derived from a pattern of racketeering activity in an interstate enterprise (§ 1962(a)) and  (2) acquire or maintain interests in the enterprise through a pattern of racketeering activity (§ 1962(b)).

*332.*     The Defendants have admitted that they intentionally conspired and agreed to engage in illegal activity directly derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as described herein.

*333.*     The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

*334.*     Said conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), and (b) in violation of 18 U.S.C. § 1962(d).

*335.*     As direct and proximate result of the Count III Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property including without limitation in that they have lost a minimum of $700,000 in legal and other professional fees necessary to defend themselves in legal actions as well as a minimum of $1,500,000.00 in lost revenues all directly caused by Defendants' harm.

*336.*     Wherefore, Plaintiff requests that this Court enter judgment against the Defendants as follows: actual damages caused by Defendants' RICO activity in an amount to be determined at trial but in any event not less than $2,200,000.00, treble damages, and attorney's fees.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Fraud as to All Defendants)

*337.*     Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

62

338.     For the relevant periods described in this Complaint, Marcel Beeler and other individuals listed herein were acting as the agent of Defendants and assisted them in wrongfully obtaining Plaintiffs' property as part of an enterprise existing for the purpose of committing fraudulent actions against numerous victims, including but not limited to the Plaintiffs, as described herein and as admitted to by Defendants in legal actions brought against them by the United States.

339.     Defendants fraudulently and without authorization caused the change of address accorded to Plaintiff Wife's account in 2005 in order to serve Defendants' own purposes.

340.     Defendants never reported this change of address to Plaintiff Wife nor asked her to authorize the change of address.

341.     Utilizing the fraudulent change of address, in 2005, Defendants took further action and enacted an unnecessary, unauthorized PEP/SCAP Exemption form for the purposes of allowing Defendants to house Plaintiffs account within the North-American division, which was engaged in the US Cross-border Business rather than in the domestic division where it was housed according to the official and authorized address provided by the account holder.

342.     Based on the fraudulent change of address and PEP/SCAP Exemption, Defendants, in 2010, sent an immensely important and time sensitive legal document to the incorrect address causing harm to Plaintiffs by denying them notice of important legal due process rights.

343.     Defendants had actual notice that the above legal notice had not been provided to Plaintiffs because the Notice was returned to Defendants marked "undeliverable".

344.     Defendants exacerbated the harm their fraud had caused Plaintiffs by never informing Plaintiffs of the return of the Notice and by taking no further action, after its return to provide it to Plaintiffs by mail, fax, or email or to notify them of its existence by phone or in person.

345.  Defendants further perpetuated the fraud by providing to a law firm, designated by the Swiss government to act as agent to those UBS customers who failed to respond to the original notice, with the *SAME* fraudulent address, thereby ensuring that Plaintiffs never had notice of the impending legal actions and no opportunity to pursue the legal due process rights afforded to them by the US/Swiss Settlement Agreement.

346.  Plaintiffs had every right to expect that Defendants, one of the world's largest and most prestigious investment banks would act in a legal, honest, and forthright manner. Defendants' misrepresentations by omission were material as evidenced by the fact that the failure to provide notice, as was Defendants' legal duty, caused a cascade of harm that forced Plaintiffs to engage in legal battles with the worlds' largest government for a decade.

347.     The Defendants intentionally, knowingly, and willfully took the fraudulent actions and then hid the same, in order to protect Defendants own interests as evident by the fact that despite many, many contacts between Plaintiffs and Defendants, both in person and by phone over the years that followed, never once did Defendants mention the existence of this vitally important legal document.

348.     Further, even after direct questioning in late 2018 whereby Defendants acknowledged that they had sent such Notice to an incorrect address, Defendants failed to inform Plaintiffs that Defendants actually retained the returned Notice and had kept it in their files. It was not until Plaintiff Wife, through her rights as a continuing customer of

Defendants, demanded a copy of the Notice in May 2019 that Defendants finally, nearly a decade late, turned over the returned Notice.

349.    Defendants knew their representations were untrue and, in addition or in the alternative, made the representation in reckless disregard for the truth of the representation as made evident by the very nature of their scheme as practiced upon the Plaintiffs.

350.    Defendants made the representation with the intent to deceive Plaintiffs and for the purpose of inducing Plaintiffs to act upon it.

351.    The Plaintiffs relied on the misrepresentations of the Defendants.

352.    Prior to 2018, Plaintiffs had no knowledge that Defendants were required to send such Notice to certain of their customers and Plaintiffs had no reason to believe that Plaintiff Wife's account would have been one of the accounts implicated in the US/Swiss/UBS snafu.

353.    Marcel Beeler and all of those UBS executives who signed the PEP/SCAP Exception Form were aware of the fraud perpetrated against Plaintiffs and provided substantial assistance in the commission of the fraud.

354.    Specifically, Marcel Beeler knew that it was he who completed and signed the Change of Address form filed in July 2005. Mr. Beeler was also well aware that he had never received a request or approval of the account holder to change the address and that the account holder had never signed a Change of Address form

355.    The other UBS executives who signed the PEP/SCAP Exemption Form had full access to the customers file and knew or should have known that there was no valid Change of Address form on file.

356.    As the direct and proximate result of the Defendants' misrepresentations, the Plaintiffs suffered damages in an amount to be determined at trial but in any event not less than $3,000,000.00.

357.    Because Defendants' misrepresentations were willful, wanton, and malicious, and were made in furtherance of a pattern of fraudulent schemes upon numerous victims and in aid of a racketeering organization, Plaintiffs are entitled to punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Fraudulent Concealment as to all Defendants)

358.    Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

359.    For the relevant periods described in this Complaint, the UBS Defendants undertook a duty to its customers when it signed the US/UBS Settlement Agreement and agreed to certain necessary actions designed to provide clients from an unwarranted but potentially devastating exposure of their private banking date to a hostile government.

360.    Defendants made a representation to Plaintiffs that they would adhere to the conditions of the Agreements reached under the auspices of the US/Swiss Tax Treaty which required Defendants to Notify affected customers of the potential threat of the release of their bank information.

361.    Within the banking relationship, Defendants committed to following the protocols and regulations of Swiss banking law. Under these protocols, Defendants were not permitted to change a clients address without specific permission and authorization from the client.

362.     Defendants concealed actions committed by UBS for the benefit of UBS which violated the laws and norms of banking. By way of example but without limitation, on or about July 27, 2005, the UBS Customer Account Manager then assigned to Plaintiffs' account, unilaterally, with no direction or authorization from Plaintiff, changed the address for the account to an address in Tel Aviv, Israel which did not belong to Plaintiffs.

363.     Defendants concealed the material fact that they had mailed the Notice, required by the US/UBS Settlement Agreement to the incorrect address, which was assigned to the account only by the actions of the UBS account manager who had no authority to do so.

364.     Defendants concealed from Plaintiffs the knowledge that Defendants had a duty to provide notice to the Plaintiffs of their right to contest the release of any information from Plaintiff Wife's account and that Defendants had a duty, under Swiss Banking law, the US/Swiss Tax Treaty and the US/UBS Settlement Agreement to notify Plaintiffs of that right.

365.     The misrepresentations were material as evidenced by the fact that following two long drawn out legal battles with the United States taxing authorities, Plaintiffs proved victorious in beating nearly $17 million dollars in proposed taxes, penalties and interest because they were able to show that Plaintiff Wife was never a U.S. person and therefor her UBS bank account never fell under the purview of the John Doe Summons and her information never should have been released.

366.     The Defendants intentionally, knowingly, and willfully hid and concealed their wrongful actions in order to benefit themselves, to maintain higher profit margins and to prevent Plaintiffs from removing substantial assets from within the UBS account.

367.     Defendants knew they were concealing material knowledge from Plaintiffs when for almost ten years they failed to provide to Plaintiffs the required Notice- even after it had been returned to them through the mails.  It is evident that Defendants were aware they were in possession of the required Notice, because they were able to produce the returned Letter and envelope when Plaintiffs finally had the knowledge needed to demand it.

368.     Defendants purposefully concealed their misrepresentation with the intent to deceive Plaintiffs for the Purpose of inducing Plaintiffs to maintain their accounts with Defendants.

369.     The Plaintiffs relied on Defendants to proceed within the tenets of Swiss Banking law, within the tenets of the international tax treaty between the United States and the Swiss Confederation and the Settlement Agreement that UBS itself signed with the United States.

370.     Plaintiffs, being well aware that Mrs. Zuhovitzky was never a U.S. person, had no reason to expect any involvement with the U.S taxing authorities over her Swiss account. Plaintiffs had no cause to be "on notice" that they should make any inquiries as to whether Mrs. Zuhovitzky's account information might be shared with the United States, just as they had not notice to be concerned that their bank might violate common, international banking laws and share that information with any other nation to which Mrs. Zuhovitzky had no tax obligations.

371.     Plaintiffs were reasonable in arriving at such belief due to the extensive relationship they had with Defendants and the facts and circumstances of the case.

372.     Defendants concealed their fraudulent actions over a number of years, at least from 2005 through 2019.

373.     Defendants were in complete control of any evidence or documents that would have provided Notice to Plaintiffs that Defendants had acted to conceal their own "bad actions"

374.     Plaintiffs only came to know of the existence of the required "Notice" when their legal counsel asked if they had a copy of such Notice because one was not included in the account documents provided to Plaintiffs through the discovery process of the case before the U.S. Tax Court.

375.     Even after Plaintiffs made direct inquiry of why they had not received such a Notice prior to Mrs. Zuhovitzky's bank details being provided to the United States, UBS only acknowledged that the Notice had been sent and to what address while still failing to provide Plaintiffs with the Notice.

376.     Plaintiffs were required to press Defendants yet again, through formal written request before Defendants acknowledged that the Notice had been returned to them and had been in their possession for nearly a decade, during which time Defendants had numerous addresses, phone numbers and opportunities during face-to-face meetings at which they could have provided Plaintiffs with the Notice.

377.     Defendants' actions in concealing their original frauds by ongoing incidences of hiding yet more information from Plaintiffs warrants the equitable tolling of all statutes of limitations due to fraudulent concealment.

*378.*     As the direct and proximate result of the Defendants' fraudulent acts, the Plaintiffs suffered damages in an amount to be determined at trial but in any event not less than $3,000,000.00.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty as to All Defendants)

*379.*     Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

*380.*     Plaintiffs' assert that Defendants owed Plaintiffs the fiduciary duties of loyalty and care.

*381.*  Defendants' fiduciary duties required that Defendants act in good faith and fair dealing with Plaintiffs and act in Plaintiffs' best interests.

*382.*  Although not all bank/client relationships have been determined to meet the standards to create a fiduciary duty, prior case have found that in personal, private banking cases where the bank is given the right to determine clients' investments, a fiduciary duty is created.

*383.*  Further, in the instant case, we refer not to the general relationship UBS had with its clients, but rather to the special relationship it created when, in order to escape from criminal prosecution of its own actions, it signed a Settlement Agreement with the United States which placed its client's interests at risk,

*384.*  By signing the US/UBS Settlement Agreement, UBS undertook to pledge to provide clients whose banking information might be wrongfully provided to the United States with an opportunity to protest and prevent the release of their information.

*385.*   Defendants breached their fiduciary duties to Plaintiffs by failing to provide Notice of their rights to protest and by actively concealing their own culpability in that failure to provide notice.

*386.*   Based on the foregoing, the Defendants failed to act in good faith and fair dealing with Plaintiffs and to act in Plaintiffs' best interests.

*387.*   As the direct and proximate result of the Defendants' fraudulent acts, the Plaintiffs suffered damages in an amount to be determined at trial but in any event not less than $3,000,000.00.

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows:

    a.   Damages based on Defendants RICO actions in an amount to be determined at trial but in any event not less than $2,200,000.00, treble damages and attorney's fees;

    b.   Damages based on Defendants fraud, concealment of fraud, and breach of fiduciary duty to be determined at trial but in any event not less than $3,000,000.00 plus punitive damages and attorney's fees

    c.   Such other and further relief as the Court deems just, proper, and equitable.

Dated: Chester, New York
       October 14, 2022

COHEN, LABARBERA & LANDRIGAN, LLP

Melissa A. Perry, Esq.
99 Brookside Avenue
Chester, New York 10918
Tel: (845) 291-1900
Fax: (845) 291-8601
Email: MPerry@cll-law.com
*Attorneys for Plaintiffs*

71