UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN ZUHOVITZKY and ESTHER ZUHOVITZKY,<br><br>                    Plaintiffs,<br><br>                    -v.-<br><br>UBS AG CHE 101.329.562, UBS AG CHE 412.669.376, UBS FINANCIAL SERVICES INC., UBS SECURITIES LLC, and UBS ASSET MANAGEMENT (US) INC.,<br><br>                    Defendants. | 21 Civ. 11124 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

A judge in California observed while resolving a similar lawsuit that "[t]he old maxim, 'two wrongs do not make a right,' aptly fits this case." *Olenicoff* v. *UBS AG*, No. 08 Civ. 1029 (AG), 2012 WL 1192911, at *1 (C.D. Cal. Apr. 10, 2012). Here, as there, Plaintiffs Jonathan and Esther Zuhovitzky seek to hold various UBS entities liable for claims arising under the civil provisions of the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. §§ 1961-1968, and related state-law fraud claims, all stemming from UBS AG CHE 101.329.562's ("UBS AG")[1] 2009 admission of guilt for helping U.S. clients hide up to $20 billion in off-shore assets from the IRS. While this conduct was blameworthy to be sure, Plaintiffs now seek to hold UBS liable for *Plaintiffs'* run-ins with the IRS, which run-ins began after the IRS's entrance

---

[1]    The Court notes that Defendants use the title "UBS AG CHE 101.329.561" when referring to UBS AG while Plaintiffs use "UBS AG CHE 101.329.562." For purposes of this Opinion, the Court uses Plaintiffs' nomenclature.

into an agreement with Switzerland to allow the Swiss Federal Tax Authority

(the "SFTA") to uncover additional fraud.  Defendants now move to dismiss the

action on several bases, including failure to state a claim.  For the reasons

discussed further in this Opinion, the Court grants Defendants' motion in full.

## BACKGROUND[2]

### A.    Factual Background

#### 1.    The Parties' Relationship

Jonathan Zuhovitzky ("Mr. Zuhovitzky"), is a citizen of Israel and

a naturalized citizen of the United States residing in Berlin, Germany.  (FAC

¶ 4).  He lived and worked in New York City from 1990 through 2010.  (*Id.*

¶ 12).  Mr. Zuhovitzky is married to Esther Zuhovitzky ("Mrs. Zuhovitzky," and

together with Mr. Zuhovitzky, "Plaintiffs"), a citizen of Austria and Israel who

currently resides in Kfar Shmaryahu, Israel.  (*Id.* ¶ 5).  Mrs. Zuhovitzky has

never been a U.S. citizen or resident, and maintains residences in Israel,

Austria, and Switzerland.  (*Id.* ¶¶ 43, 45).  Defendants comprise various UBS

---

[2]     This Opinion draws its facts from the First Amended Complaint ("FAC" (Dkt. #38)), the well-pleaded allegations of which are taken as true on this motion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Robert T. Smith ("Smith Decl., Ex. [ ]" (Dkt. #43)), including the Exemption Authorization Form for PEP or SCAP Relationships ("PEP/SCAP Form" (Dkt. #43-3)); and certain exhibits attached to the Declaration of Melissa A. Perry ("Perry Decl., Ex. [ ]" (Dkt. #46)), including the agreement between the IRS and the Swiss Confederation ("IRS/SFTA Agreement" (Dkt. #46-12)), and the settlement agreement between and among the United States, the IRS, and UBS AG ("UBS Settlement Agreement" (Dkt. #46-13)), each of which is incorporated by reference in the FAC.  *See, e.g., DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (discussing incorporation by reference and documents integral to a complaint).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #42); to Plaintiffs' memorandum of law in opposition to Defendants' motion to dismiss as "Pl. Opp." (Dkt. #45); and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #47).

entities, including UBS AG CHE 101.329.562 ("UBS AG"), UBS Switzerland AG CHE 412.669.376 ("UBS Switzerland AG"), UBS Securities LLC, UBS Financial Services Inc., and UBS Asset Management (US) Inc. (collectively, "Defendants" or "UBS").  (*Id.* ¶¶ 6-8).[3]

In 1988, Mrs. Zuhovitzky opened an account with UBS AG in Zurich, Switzerland, that she maintained from 1988 to 2014.  (FAC ¶¶ 9, 48-49).  Mr. Zuhovitzky held a Power of Attorney for the account from its opening; Mrs. Zuhovitzky relied on her husband and adult children to manage her money and business affairs throughout the relevant period due to her dyslexia.  (*Id.* ¶¶ 50, 52-53).  Given his power of attorney, Mr. Zuhovitzky also had signatory authority over the account.  (*Id.* ¶ 27).  As such, correspondence regarding Mrs. Zuhovitzky's account was initially directed to Mr. Zuhovitzky's address in New York, until Mrs. Zuhovitzky chose a "mail hold" policy by which correspondence related to her account would be held in the UBS AG Zurich branch office.  (*Id.* ¶¶ 55-56).  Various UBS employees — including Marcus Beeler ("Beeler"), the customer adviser for Mrs. Zuhovitzky's account — maintained a relationship with Mr. Zuhovitzky between 2000 and 2008 as part

---

[3]     Defendants correctly note that Plaintiffs do not attribute a single factual allegation to Defendants UBS Securities LLC, UBS Financial Services Inc., and UBS Asset Management (US) Inc.  (Def. Br. 3, 13).  While the Court discusses several bases for dismissal of the FAC *infra*, the absence of allegations involving these entities is an independent basis for dismissal of the claims against them.  *Cf. D'Addario* v. *D'Addario*, 901 F.3d 80, 103-04 (2d Cir. 2018) ("While the 'operation or management' test [of 18 U.S.C. § 1962(c)] presents a 'relatively low hurdle for plaintiffs to clear, ... especially at the pleading stage,' RICO plaintiffs must plausibly allege that each defendant played 'some part in directing the enterprise's affairs' if the RICO claim is to survive a motion to dismiss." (quoting *First Capital Asset Mgmt.* v. *Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004)).

of UBS AG's U.S. cross-border business, visiting him in person in New York and speaking with him by phone, email, or fax.  (*Id.* ¶¶ 86-88).

### 2. The Change of Address Request and the PEP/SCAP Form

On December 24, 2004, Mrs. Zuhovitzky wrote to Beeler, requesting an address change on her account to Weinplatz 3, 8001 Zurich, which change was made on January 1, 2005.  (FAC ¶¶ 60-61).  Here, according to Plaintiffs, is when Defendants' fraudulent scheme began as to them.  On July 27, 2005, Beeler "inexplicably and without authorization from [Mrs. Zuhovitzky]," changed the account address to 3 Daniel Frisch Street, 13th Floor, Tel Aviv, Israel 64731, and did not make Mr. or Mrs. Zuhovitzky aware of the change. (*Id.* ¶¶ 62-63).[4]  The address change form was signed by Beeler and other UBS employees, but not by Mr. or Mrs. Zuhovitzky.  (*Id.* ¶ 63; Perry Decl., Ex. B). Not until 2011, when she wished to change the account address from Zurich to Kfar Shmaryahu, did Mrs. Zuhovitzky discover that Beeler had unilaterally made the change six years earlier without her consent.  (FAC ¶¶ 65-69).

Shortly after this change, in October 2005, Beeler initiated the execution of a UBS "Exemption Authorization Form for PEP or SCAP Relationships" (the "PEP/SCAP Form").  (FAC ¶ 70).[5]  Plaintiffs allege that they were not advised

---

[4]     Defendants observe that, while not attached to or referenced in the FAC, Mr. Zuhovitzky sent a fax to Beeler on the day the change of address form was executed with the exact address Beeler ultimately listed on the form.  (Def. Br. 4 n.2).  Because the Court must accept the well-pleaded allegations in the FAC as true and only consider extrinsic documents when they are incorporated by reference or integral to the complaint, *see DeLuca* v. *AccessIT Grp.*, 695 F. Supp. 2d 54, 59-60 (S.D.N.Y. 2010), it declines to consider the fax here.

[5]     The PEP and SCAP concepts are discussed further *infra*.

4

about the necessity of the form; were not shown or made aware of the form until June 2017 (when a copy was provided to their U.S. tax attorney); and at no point were asked to sign the form. (*Id.* ¶¶ 71, 85). Plaintiffs acknowledge that the form recites that the reason for its completion and the attendant exemption request was that Mrs. Zuhovitzky resided in Israel while her husband resided in New York; that Mr. Zuhovitzky "decided on all investment decisions on behalf of [her] [] regarding the portfolio management"; and that Mrs. Zuhovitzky "is not involved in any investment decision." (*Id.* ¶¶ 53-54 (quotation marks omitted); PEP/SCAP Form).

Plaintiffs note that they remain unaware of the rationale for the PEP/SCAP Form and, further, that "[t]he actual regulations or considerations that might require this form are known only to the Defendants and must be clarified by them." (FAC ¶ 72). Broadly speaking, however, Plaintiffs understand PEP to refer to "politically exposed persons" for whom greater security of account data might be necessary, and SCAP to refer to certain countries, including those with more unstable political or financial regimes, where additional duties of care should be taken. (*Id.* ¶¶ 73-74). Plaintiffs contend that Israel falls into the latter category, and posit that Beeler made the allegedly unprompted address change to that country "with the intention of creating a paper trail which allowed the account to be housed within the North-America/US North-East region rather than the local Zurich division," so that Defendants could move Mrs. Zuhovitzky's account into its "U.S. cross-border business," and generate higher revenues as a result. (*Id.* ¶¶ 75-77).

As relevant to this argument, Plaintiffs discuss in detail a criminal information filed against UBS AG in 2009 and a Deferred Prosecution Agreement (the "DPA") that UBS AG entered into with the U.S. government that same year.  In the DPA, UBS AG acknowledged that it had participated in a scheme to facilitate the evasion of U.S. taxes by certain of its clients as part of its cross-border business.  (*See* FAC ¶¶ 95, 211-239, 294-304).  The aforementioned change of address form, Plaintiffs contend, was part of this conduct.  (*Id.* ¶ 103 (noting that the change of address form in 2005 was done "knowingly to further the interest of UBS and its agents and employees within its cross-border business in the United States, to which UBS has already conceded criminal conspiracy to defraud the United States and paid an $800 Million dollar penalty")).

Pursuant to the terms of the DPA, UBS was required to send a notice to all U.S.-based clients, alerting them that it would no longer provide cross-border services to U.S.-domiciled private clients through non-U.S.-regulated entities.  (FAC ¶ 122).  Plaintiffs never received this notice, which they contend is because UBS was aware that Mrs. Zuhovitzky's account was not a "U.S. Related" account inasmuch as she was not domiciled there.  (*Id.* ¶¶ 124-125).

### 3.   UBS's Disclosure of Plaintiffs' Accounts to the Swiss Government

Separately, as part of a 2009 settlement agreement between and among the United States, the IRS, and UBS AG, the United States and Switzerland entered into an agreement on August 19, 2009, whereby the SFTA would provide the IRS information for "accounts of certain U.S. persons maintained at

UBS in Switzerland," pursuant to Article 26 of the 1996 Convention Between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income. (UBS Settlement Agreement 1; *see also* FAC ¶¶ 126-127; IRS/SFTA Agreement)). Pursuant to the IRS/SFTA Agreement, the Swiss Government was to identify, as relevant here, "US domiciled clients of UBS who directly held and beneficially owned 'undisclosed (non-W-9) custody accounts' and 'banking deposit accounts' in excess of CHF 1 million … with UBS and for which a reasonable suspicion of 'tax fraud or the like' can be demonstrated." (IRS/SFTA Agreement at A-1). As Plaintiffs note, this provision applied to individuals with "authority to sign or otherwise dispose of bank accounts with UBS," and who had neither filed a Form W-9 or a Form 1099. (FAC ¶ 133). The agreed-upon criteria for determining "tax fraud or the like" included a U.S.-domiciled person who failed to file such forms. (IRS/SFTA Agreement at A-1–A-2).

Plaintiffs assert that despite Mr. Zuhovitzky having signatory authority as power of attorney over Mrs. Zuhovitzky's account and making investment decisions on her behalf (FAC ¶¶ 27, 50-54), UBS did not request that he complete a "WBEN-9,"[6] W-9, or 1099 form, precisely because of its "long-term knowledge that [Mrs. Zuhovitzky's] account was not held by a United States person" (*id.* ¶ 134). What is more, Plaintiffs note that UBS documentation unequivocally identified Mrs. Zuhovitzky (a non-U.S. person) as the sole

---

[6]     The Court understands Plaintiffs' reference to "WBEN-9" to mean IRS Form W-8BEN. *See* Form W-8BEN, IRS, *https://www.irs.gov/pub/irs-pdf/fw8ben.pdf* (last visited July 15, 2023).

beneficial owner of the account; in consequence, Plaintiffs reason, neither of them was subject to IRS requirements.  (*Id.* ¶¶ 115-120).  Regardless of the reason, neither Plaintiff filed the relevant tax forms, and Plaintiffs' information was thus sent by UBS to the Swiss Government, and from the Swiss Government to the IRS.  (*Id.* ¶¶ 100-101, 105-106).

Pursuant to the IRS/SFTA Agreement and the UBS Settlement Agreement, UBS was to provide notice to U.S.-based account holders who fell under the IRS's production request, informing them to promptly designate an agent in Switzerland for the receipt of communications regarding the IRS/SFTA Agreement's applicability to their accounts.  (FAC ¶¶ 136, 139, 145-146). Notice recipients were also advised that if the account holder failed to appoint an agent within twenty days of the notice date, the SFTA would appoint a law firm located in Zurich to serve as such agent.  (*Id.* ¶ 147).  Also pursuant to those agreements, once UBS had identified a given account as falling within the IRS/SFTA Agreement, the SFTA was to notify the account-holder's agent in Switzerland to advise him or her about the holder's rights, under Swiss law, to appeal such a decision by the SFTA to the Swiss Federal Administrative Court. (*Id.* ¶ 148).

Plaintiffs did not receive any notice from UBS because the communications were sent to the Tel Aviv address Beeler had listed four years earlier — and, Plaintiffs contend, because UBS was at all times aware that Mrs. Zuhovitzky was not subject to the IRS/SFTA Agreement.  (FAC ¶¶ 142-144, 149-151).  Plaintiffs allege that they did not become aware of the notice or the

requirement that UBS send notice until 2018, when Plaintiffs' U.S. tax counsel discovered it as part of a separate matter, despite multiple opportunities for UBS to alert them, and despite the earlier notice being returned to UBS as undelivered. (*Id.* ¶¶ 151-158).[7]  Plaintiffs allege that, but for this failure, they "would have been able to exercise the procedural rights to appeal [the IRS investigation] to which they were entitled." (*Id.* ¶ 171).

### 4. The IRS's Audit and Investigation of Plaintiffs

Following UBS's disclosure of Plaintiffs' accounts to the SFTA, the SFTA notified the IRS, which in turn initiated an income tax audit of Plaintiffs in 2011, focused on Mr. Zuhovitzky's alleged failure to report his wife's UBS account on his annual report of foreign bank and financial accounts ("FBAR"). (FAC ¶¶ 133, 148, 176-178).  The IRS chose to pursue a civil penalty against Mr. Zuhovitzky for this conduct (*id.* ¶ 178), and also referred the matter to its Criminal Investigation Division (*id.* ¶ 182).  The criminal investigation was closed with "no findings and a recommendation that there was no cause for criminal prosecution." (*Id.* ¶ 185).  However, the IRS issued a civil Notice of Deficiency based on the audit, demanding (in U.S. dollars) tax payments of $2,167,692 and penalties of $1,625,769 with additional interest, bringing the total IRS assessment to nearly $7.5 million, a portion of which represented

---

[7]  The notice was returned to UBS in Zurich as undeliverable in May 2010, and UBS made no additional attempts to contact Plaintiffs for a better address or make mention of the notice at all.  (FAC ¶¶ 156-161).  Indeed, when Mrs. Zuhovitzky went to pick up the mail being held at the Zurich branch shortly thereafter, she was not notified or given the notice.  (*Id.* ¶ 158; *see also id.* ¶¶ 160-164 (describing Plaintiffs' later visits to the Zurich branch for mail with no mention of the notice)).

penalties for civil fraud.  (*Id.* ¶ 186).  This assessment, as Plaintiffs acknowledge, was "based exclusively on the income generated on [Mrs. Zuhovitzky's account]."  (*Id.* ¶ 187).  Lastly, the IRS auditor assessed a FBAR penalty against Mr. Zuhovitzky in the amount of $5,123,000 for his willful failure to report his wife's account on his FBAR filings.  (*Id.* ¶ 189).

Plaintiffs allege that these actions, and the long and costly battles they engendered, would not have happened but for Beeler's improper change of address form in 2005.  (FAC ¶ 192).  And they further allege that Beeler's conduct and UBS's disclosure of Mrs. Zuhovitzky's account to the SFTA without notice were all part of UBS AG's multi-year scheme for which it entered into the DPA and paid, in part, $380,000,000 in disgorgement of wrongful profits earned from the "United States cross-border business."  (*Id.* ¶¶ 192, 214, 236, 247-248; *see also id.* ¶ 250 ("It is clear that in 2005, UBS manipulated the address they listed for Mrs. Zuhovitzky's account in order to hold it within their North-American division so that UBS bankers could generate greater revenue through the 'cross-border' business within the United States.")).

### 5.  Related Proceedings

Plaintiffs engaged in two other proceedings in United States federal courts to challenge the tax penalties assessed by the IRS.  First, in July 2019, Plaintiffs filed a petition with the United States Tax Court, ultimately settling with the Government after a day of trial because, as they claim, "an opinion from the Tax Court might [have] take[n] up to a year to be filed" and there was

the risk that the Government would appeal.  (FAC ¶ 197; *id.* ¶¶ 195-199).
Separately, Mr. Zuhovitzky brought suit against the U.S. Department of
Justice, the U.S. Department of Treasury, the IRS, and the individual auditor
and her supervisor who assessed the initial FBAR penalties, which case also
settled in 2021.  (*Id.* ¶¶ 206-210).[8]

## B.   Procedural Background

Following various technical difficulties, Plaintiffs initiated this action with
the filing of a complaint on April 27, 2022.  (Dkt. #4).  On May 16, 2022, the
Court scheduled an initial pretrial conference for July 26, 2022.  (Dkt. #17).
On July 27, 2022, Defendants filed a letter indicating their intent to move to
dismiss the complaint, and requested an adjournment of the initial pretrial
conference.  (Dkt. #30).  Plaintiffs filed a responsive letter on July 27, 2022.
(Dkt. #31).  The same day, the Court converted the initial pretrial conference to
a pre-motion conference and adjourned it to August 18, 2022.  (Dkt. #32).  On
August 18, 2022, the Court convened the pre-motion conference, during which
time Plaintiffs indicated their desire to file an amended complaint.  (Dkt. #35).
The Court set a schedule for the filing of Plaintiffs' amended complaint.  (Dkt.
#35).  Pursuant to that schedule, Plaintiffs filed their amended complaint on
October 14, 2022 (Dkt. #38 ("FAC")); Defendants filed their motion to dismiss
and supporting papers on December 6, 2022 (Dkt. #41-44); Plaintiffs filed their

---

[8]     Defendants note that Mrs. Zuhovitzky is also pursuing a subset of her claims in
Switzerland.  (Def. Br. 22).

opposition papers on January 6, 2023 (Dkt. #45-46); and Defendants filed their reply brief on January 27, 2023 (Dkt. #47).

On April 24, 2023, Plaintiffs filed a letter requesting leave to file a second amended complaint. (Dkt. #48). Defendants responded on April 26, 2023, noting that Plaintiffs had been given ample opportunity to pursue an amended complaint following the pre-motion conference and at any point prior to the close of briefing on the motion to dismiss. (Dkt. #49). Defendants emphasized Plaintiffs' failure to identify how they would cure the identified deficiencies in the FAC, and requested that, for efficiency's sake, the Court first adjudicate the instant motion before deciding whether to grant leave to amend a second time. (*Id.*). The Court issued an endorsement on April 27, 2023, noting that it would first resolve the instant motion and then take into consideration whether to grant Plaintiffs leave to amend. (Dkt. #50).

## DISCUSSION

Defendants have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the entirety of the FAC, and also move pursuant to the mandatory forum section clause in Mrs. Zuhovitzky's account agreement with UBS AG.[9] For the reasons that follow, the Court grants Defendants' motion to dismiss and denies Plaintiffs' request for leave to amend.

---

[9]    Defendants also move to dismiss the FAC as to Defendants UBS AG, UBS Switzerland AG, and UBS Financial Services Inc. for lack of personal jurisdiction under Rule 12(b)(2). (Def. Br. 23-24). As Defendants point out, however, because the Court has "undisputed personal jurisdiction over at least one defendant" — UBS Securities and UBS Asset Management — it may reach the merits of the claims against all Defendants. (*Id.* at 1 (quoting *Chevron Corp.* v. *Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2022)). Because it is clear that the FAC fails to plead viable claims under RICO, the Court has elected not to delve into potentially knotty personal jurisdiction issues.

12

A.    **Motions to Dismiss Under Rule 12(b)(6)**

When considering a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6), a court should "draw all reasonable inferences in [a]

[p]laintiff['s] favor, assume all well-pleaded factual allegations to be true, and

determine whether they plausibly give rise to an entitlement to relief." *Faber* v.

*Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks

and citation omitted).  "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  While the

plausibility requirement "is not akin to a 'probability requirement' … it asks for

more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Toward that end, a plaintiff must provide more than "an unadorned, the-

defendant-unlawfully-harmed-me accusation." *Id.*  Moreover, "[w]here a

complaint pleads facts that are 'merely consistent with' a defendant's liability,

it 'stops short of the line between possibility and plausibility of entitlement to

relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).  In other words, the

factual allegations must "possess enough heft to show that the pleader is

entitled to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks

omitted).

"In considering a motion to dismiss for failure to state a claim pursuant

to Rule 12(b)(6), a district court may consider the facts alleged in the

complaint, documents attached to the complaint as exhibits, and documents

13

incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States of America ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022). Beyond this narrow universe of materials, a court may also consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence" and disregard "allegations in a complaint that contradict or are inconsistent with judicially-noticed facts." *Becker* v. *Cephalon, Inc.*, No. 14 Civ. 3864 (NSR), 2015 WL 5472311, at *3, 5 (S.D.N.Y. Sept. 15, 2015) (internal quotation marks and citations omitted). However, "[a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Int'l Star Class Yacht Racing Ass'n* v. *Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (internal quotation marks and citations omitted).

## B.     The Court Grants Defendants' Motion to Dismiss

Defendants move to dismiss the FAC for failure to state a claim and, in the alternative, based on the mandatory forum selection clause set forth in UBS AG's Account Agreement and the doctrine of *forum non conveniens*.  For the reasons that follow, the Court agrees that Plaintiffs have failed to state a viable civil claim under the RICO statute, and grants Defendants' motion.

1. **Plaintiffs Have Failed to Allege Civil RICO Claims**

   a. **Applicable Law**

Defendants argue that Plaintiffs' civil RICO claims must fail for three primary reasons: (i) Plaintiffs fail to plead that Defendants' alleged acts proximately caused their injuries; (ii) Plaintiffs fail to plead a substantive violation of 18 U.S.C. § 1962(a), (b), or (d); (iii) Plaintiffs fail to plead the commission of predicate acts.  (Def. Br. 7.)  By way of background, Congress enacted RICO in 1970 to "eradicat[e] ... organized crime in the United States." *Am. Fed'n of State, Cnty. & Mun. Emp. Dist. Council 37 Health & Sec. Plan* v. *Bristol-Myers Squibb Co.*, 948 F. Supp. 2d 338, 344 (S.D.N.Y. 2013) (citing Pub. L. No. 91-452 (1970)).  Under RICO, organized crime is defined as racketeering activity, a term that "encompass[es] dozens of state and federal statutes, known in RICO parlance as predicates." *RJR Nabisco, Inc.* v. *European Cmty.*, 579 U.S. 325, 329-30 (2016).  Specifically, RICO created "four new criminal offenses involving the activities of organized criminal groups in relation to an enterprise." *Id.* at 329.  Those offenses are "founded on the concept of racketeering activity." *Id.*  An individual who commits two or more predicate acts within a ten-year period may violate RICO if "those predicate offenses are related to one another ... and the predicates amount to or pose a threat of continued criminal activity." *Elsevier, Inc.* v. *Grossmann*, No. 12 Civ. 5121 (KPF), 2017 WL 1843298, at *3 (S.D.N.Y. May 8, 2017) (internal quotation marks omitted) (citing *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989));

*see generally In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 114-27 (S.D.N.Y. 2021).

RICO establishes four criminal offenses, and, separately, a private civil cause of action. *RJR Nabisco*, 579 U.S. at 330. Sections 1962(a)-(d) make it unlawful to engage in several specific activities involving a "pattern of racketeering activity." As the Supreme Court explained:

> Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise. Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity. Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity. Finally, [Section] 1962(d) makes it unlawful to conspire to violate any of the other three prohibitions.

*Id.* "Racketeering activity," in turn, is defined to include "any act which is indictable" under specified provisions of Title 18, including mail fraud, wire fraud, and bank fraud. *Id.* § 1961(1)(B).

As relevant here, Section 1964(c) of RICO permits "'[a]ny person injured in his business or property by reason of a violation of section 1962' to bring a private civil suit in federal district court and authorizes the recovery of treble damages, attorney's fees, and costs." *Bascunan* v. *Elsaca*, 874 F.3d 806, 815-16 (2d Cir. 2017) (quoting 18 U.S.C. § 1964(c)). "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Grp.* v. *City of New York*, 559 U.S. 1, 9 (2010) (internal quotation marks

omitted).  "Proximate cause for RICO purposes ... should be evaluated in light of its common-law foundations; proximate cause thus requires some direct relation between the injury asserted and the injurious conduct alleged.  A link that is too remote, purely contingent, or indirect is insufficient."  *7 West 57th Street Realty Co.* v. *Citigroup, Inc.*, 771 F. App'x 498, 503-04 (2d Cir. 2019) (summary order) (quoting *Hemi Grp.*, 559 U.S. at 9 (alterations adopted)).

Once proximate cause is established, for a RICO claim to survive, a plaintiff must adequately allege "the existence of seven constituent elements: ([i]) that the defendant[s] ([ii]) through the commission of two or more acts ([iii]) constituting a 'pattern' ([iv]) of 'racketeering activity' ([v]) directly or indirectly invests in, or maintains an interest in, or participates in ([vi]) an 'enterprise' ([vii]) the activities of which affect interstate or foreign commerce." *MinedMap, Inc.* v. *Northway Mining, LLC*, No. 21-1480-cv, 2022 WL 570082, at *1 (2d Cir. Feb. 25, 2022) (summary order) (quoting *Moss* v. *Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (quotation marks omitted); 18 U.S.C. § 1962(a)-(c)).

### b.    Analysis

#### i.    Overview of Plaintiffs' RICO Claims

As the foundation for all of their civil RICO claims, Plaintiffs point to Defendants' admission in the 2009 DPA that they engaged in a conspiracy to defraud the United States by encouraging certain customers in their cross-border business to illegally avoid paying taxes on income earned through their UBS accounts, which conduct was done, *inter alia*, by lying to account holders

regarding the legality of actions suggested, implemented, and managed by Defendants.  (*See* FAC ¶¶ 277-278, 281, 298).  Though the DPA speaks to Defendants' fraud against the United States, Plaintiffs claim that they, too, were victims of Defendants' fraud as evidenced by Defendants:

i.   fraudulently signing and drafting the change of address form to move Mrs. Zuhovitzky's account to Israel (*id.* ¶¶ 278, 295);

ii.  fraudulently causing a PEP/SCAP Exemption to be placed on the account, which allowed Defendants to unlawfully relocate Mrs. Zuhovitzky's account within the U.S. cross-border division instead of Zurich (*id.* ¶¶ 278, 296);

iii. contacting Mr. Zuhovitzky via telephone and fax on several occasions between 2000 and 2008 to engage in banking transactions that they were not legally authorized to do within the United States, "including without limitation representations regarding the investments and status of the Account" (*id.* ¶ 282);

iv.  utilizing the mail system to send notice of Defendants' disclosure of Plaintiffs' account to the SFTA, knowing it would never be delivered to Plaintiffs (*id.* ¶ 285); and

v.   making no effort to re-deliver the notice to Plaintiffs after its return, ostensibly so that Defendants could profit by using Plaintiffs' money to "enrich themselves and their enterprise by means of an enhanced benefits package for employees within the US Cross-border Business as well as enriching the US Cross-border business itself" (*id.* ¶¶ 286-287).

Each of these predicate acts, Plaintiffs allege, constitutes mail, wire, or bank fraud.  (*Id.* ¶¶ 281-293).  Plaintiffs further allege that Defendants used the proceeds from those acts in a manner violative of 18 U.S.C. § 1962(a), (b), and (d).  (*Id.* ¶ 334; *see also* Pl. Opp. 9 ("Plaintiffs do not claim that Defendants['] agreement to the … DPA … meets the pleading requirements of a RICO claim.

18

Rather, Plaintiffs assert that the actions, delineated in the DP[A] and to which Defendants have accepted the truth and their responsibility meet the requirements of a RICO endeavor.")).

The Second Circuit has cautioned that "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Crawford* v. *Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (internal quotation marks omitted).  As a threshold matter, "[c]ivil RICO is an unusually potent weapon — the litigation equivalent of a thermonuclear device. Because the mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants, ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation."  *Gruber* v. *Gilbertson*, No. 16 Civ. 9727 (WHP), 2019 WL 4458956, at *5 (S.D.N.Y. Sept. 17, 2019) (quoting *Katzman* v. *Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996)).  Accordingly, courts "express skepticism toward civil RICO claims," and "plaintiffs wielding RICO almost always miss the mark."  *Id.* (internal quotation marks and citation omitted and alteration adopted); *see also Gross* v. *Waywell*, 628 F. Supp. 2d 475, 479-83 (S.D.N.Y. 2009) (surveying civil RICO cases and finding that they overwhelmingly fail and that "RICO's enchantment, like the siren's song, has again drawn another crew of spellbound plaintiffs foundering against the rocks").  It is thus no surprise that Defendants move to dismiss these allegations on three fronts: (i) failure to plead facts showing that Defendants'

actions were the proximate cause of their injuries; (ii) failure to plead a substantive violation under Section 1962(a), (b), and (d); and (iii) failure to plead the predicate acts of mail, wire, and bank fraud with particularity, as required by Rule 9(b).  The Court addresses each argument in turn.

### ii.    Failure to Plead Proximate Cause

Plaintiffs allege that the fraudulent actions taken with respect to Mrs. Zuhovitzky's account — which include the unauthorized execution of the change of address form and the PEP/SCAP Form as a means of moving her account to Defendants' "cross-border business"; the improper reporting of her account to the SFTA even though she was the sole owner of the account and not a U.S. citizen or domiciliary; and the fraudulent concealment of those actions to Plaintiffs' detriment — are the proximate cause of Plaintiffs' harm. (Pl. Opp. 10-11).[10]  On Plaintiffs' telling, had Defendants never executed the change of address form, Plaintiffs would have received the notice pursuant to the IRS/SFTA Agreement, and would have been able to clear up the "confusion" as to whether Mrs. Zuhovitzky's account should have been subject to disclosure to the IRS.  (*Id.*).  As noted at the beginning of this Opinion, however, two wrongs don't make a right.  In the instant case, this adage means that civil RICO allegations cannot serve as an escape route for Plaintiffs to

---

[10]    As a means of substantiating Defendants' purported motive to bring Plaintiffs' accounts into UBS's cross-border business, Plaintiffs point to certain UBS employees' visits to Mr. Zuhovitzky in New York, during which they allegedly tried to get him to agree to or finalize certain unlawful financial transactions. (*See, e.g.*, FAC ¶¶ 88-93; Pl. Opp. 10). Whether this is true or not is immaterial to the claims before this Court, as Mr. Zuhovitzky "repeatedly rebuffed any [such] attempts."  (*See* FAC ¶ 91).

avoid liability for their own unlawful conduct just because UBS also broke the law at some earlier point in time.

Pursuant to 31 C.F.R. § 1010.350(a), "[e]ach United States person having a financial interest in, or signature or other authority over, a …. financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists" in the form of an FBAR disclosure, Form TD-F 90-22.1.  If a U.S. citizen fails to comply with the statute and its regulations, the Secretary of the Treasury may impose a civil monetary penalty of up to $10,000 for a non-willful violation, unless the taxpayer shows reasonable cause for the non-compliance.  31 U.S.C. § 5321(a)(5)(B)(i)-(ii).  However, if a U.S. citizen "willfully violat[es]" or "willfully caus[es] a violation," the penalty increases to either $100,000 or 50% of the amount in the assets in the unreported account at the time of the violation, whichever is higher.  *Id.* § 5321(a)(5)(C)-(D).

Plaintiffs acknowledge that Mr. Zuhovitzky was a U.S. citizen who held signatory authority over Mrs. Zuhovitzky's account.  (FAC ¶ 27).  While Mr. Zuhovitzky may disagree as to his obligations to complete the FBAR (*see, e.g.*, *id.* ¶ 201), the fact remains that he failed to complete that form — or any other tax form — addressing his authority over his wife's account.  To the extent he protests the legal consequences of this inaction, his grievances are with the IRS, and not UBS.  *See Giordano* v. *UBS, AG*, 134 F. Supp. 3d 697, 709 (S.D.N.Y. 2015) ("Plaintiff's concealment of her Swiss Account from the IRS prevents her from making a *prima facie* showing of causation for any of her

claims, because on the face of her allegations, her own conduct is responsible for any harm she allegedly suffered."); *see also id.* (granting UBS's motion to dismiss because "Plaintiff's own failure to disclose the Swiss Account to the IRS is an insurmountable barrier to proving causation for all of her claims.").

As stated above, "to state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi Grp.*, 559 U.S. at 9 (quoting *Holmes* v. *Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).  In the RICO context, the focus of the causation inquiry "is on the directness of the relationship between the conduct and the harm."  *Id.* at 12.  Stated differently, Plaintiffs are required to demonstrate a direct relationship between Defendants' execution of the change of address form and the costs Plaintiffs incurred in challenging (and ultimately acceding to) the IRS audit or the penalties issued against Mr. Zuhovitzky for not reporting the account on an FBAR form.  This they cannot do.  As is obvious from the Court's description of the facts, multiple steps in the causal chain separate the challenged conduct from the asserted injury.  Similar to the facts of *Hemi Group* v. *City of New York*, 559 U.S. at 15, Plaintiffs' theory of liability "rests on the independent actions of third and even fourth parties," *id.*, which include, *inter alia*, (i) the entry of the IRS and the Swiss Government into an agreement to share information regarding certain accounts; (ii) Defendants' release of Plaintiffs' information to the SFTA (but not the IRS); (iii) the SFTA's reporting of such information to the

IRS;[11] and (iv) the IRS's independent audit and concomitant proceedings.[12] This is plainly insufficient to establish proximate causation.  *See Doe* v. *Trump Corp.*, 385 F. Supp. 3d 265, 276-77 (S.D.N.Y. 2019) ("[E]ven at the pleading stage, civil RICO's direct relation requirement is rigorous and requires dismissal where substantial intervening factors attenuate the causal connection between the defendant's conduct and the plaintiff's injury.").

The Court pauses briefly to note that the alleged predicate acts of mail fraud, wire fraud, and bank fraud are sourced to the same conduct — namely, the factual allegations underlying the DPA, in which UBS AG acknowledged that it had participated in a scheme to facilitate the evasion of U.S. taxes by certain of its accountholders.  (*See* FAC ¶ 229).  However, the DPA does not describe any misconduct directed at those UBS accountholders; it concerns steps undertaken by UBS to assist certain clients in concealing their income from the U.S. tax authorities, and *not* a scheme by UBS to trick its own customers into committing tax violations (which would serve neither UBS's interests nor those of its clients).  Notably, Plaintiffs do not allege that UBS was ever engaged to provide Plaintiffs with any tax advice, or that it ever told Mr.

---

[11]    Plaintiffs make much of the fact that, with notice, they would have been able to appeal the decision of the SFTA.  (FAC ¶¶ 148, 171).  In so doing, they overlook the fact that they would also have had to succeed in their appeal.

[12]    Plaintiffs' sole basis for its opposition on this point is that Mrs. Zuhovitzky has never been a U.S. person and therefore "NEVER had any duty to report her UBS account, any other foreign account, asset, or holding of any sort to the United States." (Pl. Opp. 13).  Plaintiffs miss the point.  It was *Mr.* Zuhovitzky who was subject to the IRS's audit because he failed to comply with his FBAR filing obligations as a signatory to his wife's non-U.S. account.  Whether UBS should have alerted the SFTA as to this issue, whether the SFTA should then have reported the matter to the IRS, and whether the IRS should have initiated an audit, are not issues for this Court to resolve in determining the adequacy of pleading of Plaintiffs' RICO claims.

Zuhovitzky not to report his wife's account on his FBARs.  Quite to the contrary, Plaintiffs note that "at no time that [Mrs. Zuhovitzky's] account was open did Plaintiffs receive any requests from UBS for either husband or wife to complete a WBEN-9, W-9, or 1099 form."  (FAC ¶ 134).  Plaintiffs cannot simply tack on the words "cross-border business" to Defendants' actions *vis-a-vis* Mrs. Zuhovitzky's account and suddenly align the subject matter of the DPA with the conduct at issue in this litigation.  (*See id.* ¶ 214).  Indeed, it borders on disingenuous to suggest that Plaintiffs "had zero tax problems until Defendants['] malfeasance caused them [to] wrestle with the IRS."  (Pl. Opp. 13; *see also* Def. Reply 2 ("[W]hatever [Mrs. Zuhovitzky's] obligations, it was [Mr. Zuhovitzky's] failure to comply with U.S. tax law that ultimately led to the injuries about which the Zuhovitzkys complain.")).  Because proximate cause has not been sufficiently pleaded, Plaintiffs' RICO claims fail as a matter of law and must be dismissed on this basis alone.  *See Doe*, 385 F. Supp. 3d at 283.

### iii.    Failure to Plead Substantive Violations

Defendants further move to dismiss the RICO claims based on Plaintiffs' ostensible failure to plead a substantive violation of the RICO statute.  As noted earlier:

> Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise.  Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity.  Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity.  Finally, [Section] 1962(d) makes it unlawful to conspire to violate any of the other three prohibitions.

*RJR Nabisco*, 579 U.S. at 330.  To state a claim under Section 1962(a), putative plaintiffs must allege "([i]) that the defendants "used or invested racketeering income to acquire or maintain an interest in the alleged enterprise; and ([ii]) that the plaintiffs suffered injury as a result of that investment by the defendants."  *4 K & D Corp.* v. *Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 543 (S.D.N.Y. 2014) (internal quotation marks omitted).  Similarly, Section 1962(b) makes it "unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1962(b).

Plaintiffs here allege that Defendants have violated Sections 1962(a), (b), and (d).  The alleged RICO enterprise is the group of Defendants as a whole — UBS AG and its wholly-owned subsidiaries — functioning collectively to deceive innocent investors into thinking that they are upstanding professionals and persuading such investors to make various investment decisions, when in fact Defendants were operating "outside the legal bounds of the jurisdiction and endangering customers['] assets in real property to an attorney escrow account." (FAC ¶ 306).  This conduct, Plaintiffs allege, has "gone on for years, across the globe, swindling victims ..., demonstrating a longevity sufficient to permit those associates to pursue the enterprise's purpose."  (*Id.* ¶ 307).

With particular respect to Section 1962(a), Plaintiffs allege that Defendants, as part of this ongoing enterprise, received funds from Plaintiffs and other victims as part of their mail, wire, and bank fraud predicate offenses,

which ill-gotten profits they then invested into Defendants' corporate structures and assets in furtherance of the cross-border business, "thereby benefitting Defendants while harming their victims." (FAC ¶¶ 308, 310). These profits, Plaintiffs allege, were "in the form of Plaintiffs' money as well as investment monies from other victims, as well as enhanced fees for service," obtained as a result of the conduct UBS AG to which admitted in the DPA. (*Id.* ¶ 309). As to causation, Plaintiffs allege that they were injured in the amount of $700,000 in legal and other professional fees, as well as a minimum of $1,500,000 in lost revenues, all caused by the investment of the racketeering income into Defendants' cross-border business. (*Id.* ¶ 315). This cross-border business investment, Plaintiffs allege, led Defendants' employees and agents (like Beeler) to "grow increasingly bold in their illicit behaviors, including but not limited to forging client documents" like the address change form. (*Id.* ¶ 312; *see also id.* ¶ 315).

In a similar vein, Plaintiffs allege for their Section 1962(b) claim that Defendants utilized the capital investments of Plaintiffs, as obtained through the issuance of, *inter alia*, the change of address form, as well as proceeds unlawfully obtained through their fraudulent investment scheme, to "acquire, maintain, and grow an enterprise engaged in racketeering." (FAC ¶ 320). It is only in the waning paragraphs of the FAC that Plaintiffs first contend that Defendants fraudulently induced Plaintiffs to invest funds with them in a manner that benefitted Defendants and harmed Plaintiffs "and other victims." (*Id.*). The Court understands this assertion to be Plaintiffs' attempt to suggest

that, despite the fact that the conduct at issue in this litigation was neither addressed in nor contemplated by the DPA, the conduct that *was* addressed in the DPA also harmed Plaintiffs.

Defendants argue that Plaintiffs have failed to plead an investment or acquisition injury under either Section 1962(a) or (b). (Def. Br. 9-10). Indeed, an injury either subsection must be tied to "something acquired through the use of illegal activities or by money obtained from illegal activities," and cannot be injury arising from the illegal activities themselves. *In re Tether*, 567 F. Supp. 3d at 124 (quoting *Nat'l Org. for Women, Inc.* v. *Scheidler*, 510 U.S. 249, 259 (1994)). As to Section 1962(a), Defendants argue that Plaintiffs have solely and impermissibly alleged an injury caused by the pattern of racketeering activity itself, not injury pursuant to "the use or investment of the proceeds of that activity." (Def. Br. 9-10 (quoting *Ideal Steel Supply Corp.* v. *Anza*, 652 F.3d 310, 322 (2d Cir. 2011))). As to Section 1962(b), Defendants argue that the FAC merely states that they "invested the proceeds of their racketeering offenses against their victims and used said proceeds to acquire, maintain, and grow an enterprise engaged in racketeering." (FAC ¶ 320). Beyond this, the FAC is devoid of any allegations that they actually used proceeds to acquire any other legitimate business, let alone that Plaintiffs were victims of such conduct. (Def. Br. 10). The Court agrees.

Plaintiffs present no substantive responses to Defendants' arguments, except to suggest that Defendants misunderstand the holding of *Ideal Steel*, and that "to the extent that a RICO enterprise invests the proceeds of their

'pattern of racketeering activity,' to establish, expand[,] and operate new or further activity, the requirements of § 1962(a) (and presumably § 1962(b)) are met." (Pl. Opp. 14 (citing *Ideal Steel*, 652 F.3d at 323)).  That is plainly not the holding of *Ideal Steel*.  As the Second Circuit made clear, "the plaintiff asserting a civil RICO claim based on a violation of subsection (a) must show injury caused not by the pattern of racketeering activity itself, but rather by the use or investment of the proceeds of that activity."  652 F.3d at 321 (citing *Ouaknine* v. *MacFarlane*, 897 F.2d 75, 82-83 (2d Cir. 1990)).  In *Ideal Steel*, the Second Circuit found a plaintiff's claim arising under subsection (a) to be sufficient because the defendants "did not [(contrary to here)] merely reinvest in the same entity.  Rather, [defendants] created a new company," which, in turn, funded the purchase of a new national store in furtherance of the scheme.  *Id.* at 322.  Importantly, the opening of the new store was found to have caused plaintiff harm because it caused plaintiff's competing store to lose a substantial amount of business due to the defendants' ability to charge lower prices as a result of the tax fraud scheme.  *Id.* at 314.

Here, Plaintiffs' claim under subsection (a) is that Defendants "used and invested" the income gained from their wire, bank, and mail fraud "in furtherance of the US Cross-border business," which the Court understands to be investing in the very same enterprise that served as the vehicle for the predicate acts of wire, mail, and bank fraud.  (FAC ¶ 310).  As such, *Ideal Steel* plainly forecloses recovery under subsections (a) and (b).  Indeed, where "defendants simply invest[] the income derived from a fraudulent scheme in the

same enterprise alleged to have been the vehicle through which [d]efendants engaged in the unlawful predicate acts, the acquisition or maintenance of interest in or control of the enterprise could not have caused any injury that was separate and distinct from the injury caused by the predicate acts." *4 K & D Corp.*, 2 F. Supp. 3d at 544-45 (internal quotation marks and citations omitted and alterations adopted).  Accordingly, Plaintiffs "[have] no cause of action under §§ 1962(a) and 1962(b)." *Id.* at 545.  While Plaintiffs note that the Court should look to the "plain meaning" of the RICO statute, the Court is not free to ignore clear and unequivocal precedent on the matter.  (*See* Pl. Opp. 13).

Because the Court finds that Plaintiffs have failed to plead a substantive violation of Sections 1962(a) or (b), it must similarly dismiss the Section 1962(d) claim.  *See In re Tether*, 576 F. Supp. 3d at 127 (citing *First Cap. Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) (collecting cases)); 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a) [or] (b) of this section.").  This pleading failure operates as a second, independent basis for dismissal.

### iv.    Failure to Plead Predicate Acts

As a third basis for dismissal of Plaintiffs' civil RICO claims, Defendants argue that Plaintiffs fail to plead predicate acts of mail fraud, wire fraud, and bank fraud with sufficient particularity, as required by *Twombly* and Rule 9(b). Indeed, in the context of a civil RICO claim, "all allegations of fraudulent predicate acts[] are subject to the heightened pleading requirement of Federal Rule of Civil Procedure 9(b)." *First Cap. Asset Mgmt., Inc.*, 385 F.3d at 178.

"This includes allegations of predicate acts of [bank,] mail and wire fraud." *Angermeir* v. *Cohen*, 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014) (citing *Spool* v. *World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (holding that plaintiff's mail and wire fraud allegations were not "pled with the requisite particularity" under Rule 9(b))); *see also Jus Punjabi, LLC* v. *Get Punjabi US, Inc.*, 640 F. App'x 56, 58 (2d Cir. 2016) (summary order) (discussing the need to plead fraud claims with particularity pursuant to Rule 9(b)).

"The essential elements of a mail or wire fraud violation are ([i]) a scheme to defraud, ([ii]) money or property as the object of the scheme, and ([iii] use of the mails or wires to further the scheme." *United States* v. *Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (internal quotation marks omitted). Similarly, the federal bank fraud statute criminalizes the "'knowing execution' of a scheme to 'defraud a financial institution.'" *United States* v. *Bouchard*, 828 F.3d 116, 124 (2d Cir. 2016) (quoting 18 U.S.C. § 1344) (brackets omitted). In general, "[p]laintiffs must plead ... fraud with particularity, and establish that the [communications] were in furtherance of a fraudulent scheme." *Lundy* v. *Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013). "To satisfy this requirement, a complaint must 'specify the time, place, speaker, and content of the alleged misrepresentations,' 'explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'" *Jus Punjabi, LLC*, 640 F. App'x at 58 (quoting *Cohen* v. *S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir.

2013) (alteration in original) (then quoting *Caputo* v. *Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001)).  Plaintiffs have failed to meet this exacting standard.

Plaintiffs allege that "Defendants" or "UBS" committed mail, wire, and bank fraud by (i) contacting Mr. Zuhovitzky on several occasions to engage in banking transactions they were not authorized to do within the United States "by means of the mails and/or electronic mails, including without limitation representations regarding the investments and status of the Account" (FAC ¶ 282); (ii) using mail or wires to send important legal notices that they knew would never be delivered to Plaintiffs (*id.* ¶ 283); and (iii) summarily causing a fraudulent change of address form to be entered into UBS computers (*id.* ¶ 284), all of which was allegedly done as a means of "obtaining money or property by means of false or fraudulent pretenses, representations, or promises," as part of the conduct set forth in the DPA (*id.* ¶ 289).

Preliminarily, Plaintiffs fail to specify which Defendants were involved, instead summarily referring to "UBS" or "Defendants" as a group.  (*See* FAC ¶¶ 22-23, 167-171, 247-253, 277-336).  As to each of the allegations described above, Plaintiffs fail to plead with any particularity a single fact suggesting that a fraudulent scheme was occurring or the content of the alleged misrepresentations, let alone facts giving rise to a strong inference of Defendants' intent to defraud.  Instead, Plaintiffs tack on the words "mail" and "wire," and then thinly connect certain acts to a DPA in which Plaintiffs were not implicated.  Even Plaintiffs admit to this point, noting in their opposition

that "the scheme to defraud was already established" by virtue of the DPA.  (Pl.

Opp. 17-18).  This is plainly inadequate.

Plaintiffs cannot hang their pleading hats on UBS AG's admissions in the

DPA.  The DPA did not involve the acts alleged in Plaintiffs' FAC, and Plaintiffs

plead no specific connection between the DPA and the conduct here.  (Def.

Br. 13-14 (citing, *e.g.*, *O'Hagin's, Inc.* v. *UBS AG*, No. SA CV 16-0716-DOC

(JEMX), 2016 WL 11774033, at *6 (C.D. Cal. Oct. 11, 2016); *Roberts* v. *UBS*

*AG*, No. 12 Civ. 724 (LJO), 2013 WL 1499341, at *15 (E.D. Cal. Apr. 11,

2013))).  As discussed, Plaintiffs' contention that Defendants executed a

fraudulent change of address form as a means of facilitating their U.S. cross-

border business not only defies logic, but also fails to bring that allegation

within the ambit of the conduct addressed in the DPA.  The change of address

form, whatever its genesis, has nothing to do with Defendants' "conspiracy to

defraud the United States by encouraging customers to illegally avoid paying

taxes on the income earned through UBS accounts."  (FAC ¶ 278).  No such

conduct was pleaded as to Defendants in the FAC, and even if it somehow was,

it was not done with the requisite degree of particularity.

Plaintiffs assert that "it is clear that [Mrs. Zuhovitzky's address] was

changed from Zurich (which presumably would have made it a 'domestic'

account) to Israel," and that "the PEP/SCAP form was then created for the

specific purpose of allowing UBS employees and directors to manage the

account within the UBS cross-border US business."  (Pl. Opp. 6).  Plaintiffs

seem to be under the impression that any action taken by any UBS entity or

person in the United States was somehow subject to the DPA. Similarly reflective of this misperception, Plaintiffs also contend that "[a]ny official contact between UBS bankers and Mr. Zuhovitzky in NYC violated U.S. laws as acknowledged by UBA in [the DPA]." (FAC ¶ 90). Not so. Even if it were true, however, Plaintiffs allege that "Mr. Zuhovitzky repeatedly rebuffed any attempts by UBS cross-border staff to engage in anything other than purely social interactions while in the United States" (*id.* ¶ 91), and "categorically refused" to receive any bank documents in New York (*id.* ¶ 92). These "[b]are-bones allegations do not satisfy Rule 9(b)." *Lundy,* 711 F.3d at 119. "Plaintiffs cannot simply cast a wide net and hope that one or more of the defendants will fall in." *Jus Punjabi, LLC,* v. *Get Punjabi Inc.,* No. 14 Civ. 3318 (GHW), 2015 WL 2400182, at *5 (S.D.N.Y. May 20, 2015).

In short, Defendants are correct that Plaintiffs' civil RICO claims fail in at least three different respects.[13] Because Plaintiffs fail to establish proximate

---

[13]   Defendants also allege that Plaintiffs' RICO claims are (i) time-barred pursuant to the RICO statute's four-year statute of limitations and (ii) impermissibly extraterritorial. (Def. Br. 14-15, 18-19). Because Plaintiffs' RICO claims plainly fail as a matter of pleading, the Court need not reach the timeliness or extraterritoriality issues.

Additionally, Defendants make several alternative arguments as to why this action should be dismissed — namely, that (i) the forum selection clause in the parties' Account Agreement requiring litigation of disputes in Zurich is mandatory, *prima facie* valid, and binding on Mrs. Zuhovitzky and her husband (Def. Br. 20-21); and (ii) the doctrine of *forum non conveniens* mandates dismissal of this case because Switzerland, not New York, is at the center of this dispute (*id.* at 21-23). Here, too, because the Court dismisses this case for failure to state a claim, it need not reach these issues. However, the Court notes that the text of the forum selection clause in Mrs. Zuhovitzky's Account Agreement clearly mandates that any case be brought in Zurich, not New York. (*See* Smith Decl., Ex. 1 at 2 (noting that the "exclusive place of jurisdiction for any disputes arising out of and in connection with the present Agreement … shall be Zurich.")).

It is equally clear that the forum selection clause applies to this case because (i) UBS's disclosure of the account at issue and the IRS action that followed clearly arose out of the parties' contractual relationship; (ii) forum selection clauses apply to tort as well as

cause (and therefore standing to bring a RICO claim), and fail to adequately plead both substantive violations and predicate acts as required by the RICO statute and the relevant caselaw, the Court grants Defendants' motion to dismiss the claims with prejudice under Rule 12(b)(6).

### 2.    The Court Declines to Exercise Supplemental Jurisdiction over Plaintiffs' Remaining State-Law Claims

Defendants further move to dismiss Plaintiffs' state-law claims on timeliness grounds and for failure to state a claim.  *See* 28 U.S.C. § 1367(c)(3) ("[t]he district courts may decline to exercise supplemental jurisdiction ... if ... the district court has dismissed all claims over which it has original jurisdiction").  The Court, however, elects a different path.  Where the federal claims are dismissed before trial, "even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  *First Cap. Asset Mgmt., Inc.*, 385 F.3d at 183 (quoting *Castellano* v. *Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991)).  For these reasons, the Court declines to exercise its supplemental jurisdiction over the state-law claims and dismisses them without prejudice.

---

contract claims, especially in light of the broad language of the clause, *see Lurie* v. *Norwegian Cruise Lines, Ltd.*, 305 F. Supp. 2d 352, 363 (S.D.N.Y. 2004); (iii) Mr. Zuhovitzky is similarly bound, even as a non-signatory, because his interests are "'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct," *Cognizant Tech. Sols. Corp.* v. *Bohrer PLLC*, No. 21 Civ. 5340 (RA), 2022 WL 1720319, at *4 (S.D.N.Y. May 27, 2022) (quoting *Cuno, Inc.* v. *Hayward Indus. Prods., Inc.*, No. 03 Civ. 3076 (MBM), 2005 WL 1123877, at *6 (S.D.N.Y. May 10, 2005)); and (iv) the Account Agreement was not a contract of adhesion.  *See OConner* v. *Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 602 (S.D.N.Y. 2020) (noting that "[a] court will find adhesion only when the party seeking to rescind the contract establishes that the other party used high pressure tactics, or deceptive language, or that the contract is unconscionable").

### 3.     The Court Denies Plaintiffs Leave to Amend

Lastly, Plaintiffs seek leave to amend their pleadings, both in their opposition brief and in a separate letter filed before this Court on April 24, 2023.  (Pl. Opp. 25; Dkt. #48).  While the Federal Rules dictate that the court should "freely give leave" to amend "when justice so requires," Fed. R. Civ. P. 15(a), there is no requirement that every request be granted, and the decision remains "within the District Court's discretion."  *Panther Partners Inc.* v. *Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 621 (2d Cir. 2009) (summary order).  Leave to amend need not be given when a plaintiff fails to specify how amendment would cure the complaint's deficiencies or how the opportunity to furnish additional allegations would lead to a different result.  *See TechnoMarine SA* v. *Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014); *Hayden* v. *Cnty. of Nassau*, 180 F.3d 42, 53-54 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied.").  Further, because of the various failings discussed above, the Court finds that amendment would be futile, and denies Plaintiffs' request.

## CONCLUSION

In light of the foregoing, Defendants' motion to dismiss is GRANTED and Plaintiffs' request for leave to amend is DENIED.  In particular, the Court dismisses Plaintiffs' civil RICO claims with prejudice, and dismisses Plaintiffs' state-law claims without prejudice to their refiling in state court.  The Clerk of

Court is instructed to terminate all pending motions, adjourn all remaining

deadlines, and close this case.

SO ORDERED.

Dated:       July 18, 2023
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge